COMMERCE BANK, N.A., Respondent,

v.

Robert Hudson BLASDEL, William Phillip Blasdel, and Barbara Blasdel Alexander, Respondents,

and

Deborah Peck Durland, Patricia Ann Jackson, Glenn C. Willard, James Barry Willard, Janice Lee Borofka, and Ray Burt Willard, Appellants.

No. WD 61941.

Missouri Court of Appeals, Western District, En Banc.

Aug. 24, 2004.

Brian J. Madden, Kansas City, for appellants.

Charles W. German, Kansas City, for respondent Commerce Bank.

Curtis L. Tideman, Overland Park, for respondents Blasdels.

Before JOSEPH M. ELLIS, Chief Judge, HAROLD L. LOWENSTEIN, ROBERT G. ULRICH, PAUL M. SPINDEN, JAMES M. SMART, JR., EDWIN H. SMITH, VICTOR C. HOWARD, THOMAS H. NEWTON, RONALD R. HOLLIGER, LISA WHITE HARDWICK, Judges, and WILLIAM E. TURNAGE, Senior Judge.

JOSEPH M. ELLIS, Judge.

The two adopted adult children of Francis G. Blasdel, Jr. ("the Blasdel adoptees") and the four adopted adult children of Theodore C. Hudson ("the Hudson adoptees") are quarreling with Francis' three natural-born children ("the natural children") over terminating distributions of a very large sum of money from three trusts. After one of the natural children made a demand on the trustee, Commerce Bank, N.A., to deny the Blasdel and Hudson adoptees any distribution whatsoever from any of the three trusts, Commerce Bank filed this declaratory judgment action seeking the circuit court's determination as to their proper construction. The natural children filed a cross-claim against the Blasdel adoptees seeking actual and punitive damages for tortious interference with their inheritance expectancy, and the Blasdel adoptees subsequently counter cross-claimed against the natural children on the same grounds, seeking only actual damages. The circuit court determined that the settlors of the trusts intended to exclude both the Blasdel and Hudson adoptees from the class of "lineal descendants" entitled to take under the terms of the instruments creating the trusts. It also found in favor of the natural children and against the Blasdel adoptees on their respective cross-claims, but awarded the natural children $0 in actual and punitive damages since they presented no evidence on the issue of damages. The Blasdel and Hudson adoptees appeal, assigning four points of error. After briefing and oral argument but before opinion, we ordered the case transferred to this Court *en banc* for reargument. We reverse in part, affirm in part, and remand with instructions.

### The Parties

Francis had three natural children (Barbara Blasdel Alexander, Robert H. Blasdel, and William P. Blasdel) by his first wife before divorcing her in early 1968 and marrying Ann Jackson Blasdel in October 1968. Francis and Ann were still married when he died almost 32 years later, in January 2000. Ann had mothered three children of her own (Thomas J. Flavin, Jr., Patricia A. Jackson, and Deborah P. Durland) during a previous marriage, which also ended in divorce in early 1968. When Ann married Francis, her children ranged in age from 18 to 26 years old. In June 1978, Francis adopted Patricia (then 34) and Deborah (then 27). Francis never adopted Thomas, who died in 1985.

Although he was married twice, Theodore fathered no natural-born children during his lifetime. His first marriage ended in divorce in 1966. In August 1973, he married Beverly Pedersen Hudson, and they remained married until his death in August 1999. Beverly had mothered four children (Ray B. Willard, Glenn C. Willard, James B. Willard, and Janice L. Borofka) during a previous marriage, which terminated in divorce in 1954. When Beverly and Theodore got married, those children ranged in age from 22 to 31. In November 1975, Theodore adopted Ray (then 27) and Glenn (then 25). In June 1978, Theodore adopted James (then 31), and in October 1983, he adopted Janice (then 41).

### The Trusts

In March 1949, Gertrude Elizabeth Hudson Jaccard, Adah Hudson Jaccard, Bendena Hudson Blasdel, and Mathilde C. Hudson[1] formed an *inter vivos* trust (the "*inter vivos* trust"). The trust instrument provided that each of them would receive one-fourth of the trust's net income for the remainder of their lives. It also provided that, upon the death of Gertrude or Adah,

---

1. Gertrude, Adah, and Bendena were sisters, and Mathilde was their sister-in-law.

their shares would be divided equally among and paid to the surviving settlors. The trust further instructed that, when Bendena died, her share was to pass to her son Francis, if then living, "or to his lineal descendants, per stirpes," if not.

Likewise, the trust provided that, when Mathilde died, her share was to pass to her son Theodore, if then living, "or to his lineal descendants, per stirpes," if not. The *inter vivos* trust instrument also directed that the trust was to terminate when the settlors and their sons had all died. On termination of the trust, its *corpus*, including all accrued and undistributed income, was to "be divided among and paid in equal shares, per stirpes, to the lineal descendants then living" of Bendena and Mathilde. In the event there were no such lineal descendants at the time the trust was terminated, the *corpus* was to be "paid over and delivered" to the Jackson County Society for Crippled Children. In the circuit court, the natural children, the Blasdel adoptees, and the Hudson adoptees all claimed under the terms of this trust.

In May 1949, Gertrude executed a will creating "three (3) equal, separate and distinct" testamentary trusts: one for the benefit of Bendena, one for the benefit of Mathilde, and the third for the benefit of Adah. (The assets in these trusts were entirely separate from those involved in the prior *inter vivos* trust.) The first of these trusts (the "first testamentary trust") provided income to Bendena for the remainder of her life, and then to her son Francis for the remainder of his life. When Francis died, the *corpus* of this trust was to be divided among and paid over to Francis' "lineal descendants" then living *per stirpes* if those descendants were at least 30 years old. As modified by codicils executed on April 26, 1954 and January 26, 1955, the trust further provided that should Francis "be not survived by a lineal descendant, or in case all of his lineal descendants shall die after his death and prior to receiving the remainder of this Trust estate as hereinabove provided," the remainder of the trust estate was to "be added to and made a part of THE WALTER M. JACCARD [2] MEMORIAL TRUST FUND," which had been created in another part of the will and whose net income was to "be used to pay the hospital and nursing bills for indigent old men" in Saint Luke's Hospital of Kansas City (or its successors), particularly those "worthy indigent old men who are unable to pay for said services themselves and are in real need of hospitalization." In the circuit court, both the natural children and the Blasdel adoptees, all of five of whom meet the age criterion, claimed under the terms of this trust.

The second of these trusts (the "second testamentary trust") had parallel terms. It provided income to Mathilde for the remainder of her life, and then to her son Theodore for the remainder of his life. When Theodore died, the *corpus* of this trust was to be divided among and paid over to Theodore's "lineal descendants" then living *per stirpes* if those descendants were at least 30 years old. As modified by codicils executed on April 26, 1954 and January 26, 1955, the trust further provided that should Theodore "be not survived by a lineal descendant, or in case all of his lineal descendants shall die after his death and prior to receiving the remainder of this Trust Estate as hereinabove provided," the remainder of the trust estate was to be added to and made a part of The Walter M. Jaccard Memorial Trust Fund described *supra*. In the circuit court, only the Hudson adoptees, all four of whom

---

2. Walter M. Jaccard was Gertrude's husband. He died in 1948.

meet the age criterion, claimed under the terms of this trust.[3]

The last of the trusts (the "third testamentary trust") established in Gertrude's May 1949 will was created for the benefit of her sister Adah. It provided income to Adah for the remainder of her life, and then to her husband Ernest A. Jaccard for the remainder of his life. Upon the deaths of both Adah and Ernest, the trust was to terminate and its remaining assets, including any accrued or undistributed income, were to be "added to and made a part of The Betty Jaccard[4] Memorial Trust for Crippled Children," which had originally been established earlier in the will, evidently "to pay the hospital and nursing bills of sick, indigent old women or of sick or crippled children[.]" In the circuit court, none of the parties claimed under the terms of this trust.[5] However, as will become apparent *post*, the existence and particular terms of this trust have significant value in ascertaining Gertrude's testamentary intent.

Mathilde died in 1968, having been predeceased by Adah (in 1954), Gertrude (in 1960), and Bendena (in 1967). Theodore died in August 1999.[6] In January 2000, Francis passed away as well, thereby triggering the terminating distribution process under the trusts. This protracted litigation commenced in August, 2000, and has culminated in the instant appeal from the circuit court's final judgment construing the trusts.

### The Circuit Court's Judgment

In construing the trusts, the circuit court reached the following legal conclusions: (1) neither of the two Blasdel adoptees are lineal descendants of Francis, who died with only three surviving lineal descendants—the natural children; (2) none of the four Hudson adoptees are lineal descendants of Theodore, who died without any surviving lineal descendents; (3) the natural children "are the sole lineal descendants entitled to distribution of both the Blasdel and Hudson shares of the testamentary trusts and the Gertrude Jac-

3. In 1990, Theodore and the Hudson adoptees initiated an action in the Circuit Court of Jackson County seeking to establish whether or not the adoptees would be entitled, as Theodore's "lineal descendants," to any part of his share of the second testamentary trust estate upon his death. Although Theodore's deposition was taken in March 1991, that action was subsequently dismissed without prejudice sometime thereafter.

4. Although apparently overlooked by the circuit court, which found that "Gertrude Jaccard had no natural born or adopted children," the record clearly demonstrates that Gertrude and Walter Jaccard raised an adopted child named Elizabeth "Betty" Jaccard. Betty, who was evidently a beautiful young woman and an exceptionally talented pianist, died at the age of 20 after a tragic automobile accident in 1929 following her graduation from junior college.

5. Adah passed away in 1954. For this reason, in a codicil executed on January 26, 1955, Gertrude revoked the trust she had

originally established for Adah's benefit. The trust's assets and accumulated income were divided into two equal portions, which were then added to the *corpus* of the two testamentary trusts Gertrude had previously created for the benefit of Bendena and Mathilde. This distribution was completed nearly 50 years ago, and is not at issue in this litigation. A few months earlier, Gertrude had also executed a codicil substituting "THE WALTER M. JACCARD MEMORIAL TRUST FUND," described *supra*, for "The Betty Jaccard Memorial Trust for Crippled Children."

6. From the date of Theodore's death to the end of July 2000, Commerce distributed to the Hudson adoptees the income stream Theodore had been enjoying during his lifetime under the terms of the second testamentary trust. The Hudson adoptees received $6,706.43 in such income during this 11–month period.

card, et al., *inter vivos* trust"; [7] (4) Commerce Bank was entitled to recover the above-mentioned $6,706.43 from the Hudson adoptees; (5) the natural children and Commerce were entitled to recover their costs from the Blasdel and Hudson adoptees; and (6) Commerce was entitled to recover its reasonable attorney's fees in prosecuting its declaratory judgment action, "to be paid from the trust estates."

### Standard of Review

"The standard of review in declaratory judgment cases is the same as in any other court-tried case. This Court will affirm the decision of the trial court 'unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.'" *Kerperien v. Lumberman's Mut. Cas. Co.*, 100 S.W.3d 778, 780 (Mo. banc 2003) (quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "Questions of law are matters reserved for *de novo* review by the appellate court, and we therefore give no deference to the trial court's judgment in such matters." *H & B Masonry Co., Inc. v. Davis*, 32 S.W.3d 120, 124 (Mo.App. E.D.2000). However, we must give "due regard to the opportunity of the trial court to have judged the credibility of witnesses," Rule 84.13(d)(2), and are bound to "exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32.

### Analysis of the Trust Instruments

In their first point relied on, the Blasdel and Hudson adoptees argue that the circuit court erred in concluding that the trusts' settlors intended to exclude them from the class of lineal descendants entitled to take under the terms of the instruments creating the trusts because the language of the trust instruments themselves evinced no such intent on the part of the settlors. We agree.

At the outset, we wish to clarify an important issue not explicitly addressed by the circuit court in its findings, or by the parties in their briefs. As discussed *supra*, the *inter vivos* trust instrument directed that the trust was to terminate when both the settlors and their sons had all died. On termination of the trust, its *corpus* was to "be divided among and paid in equal shares, per stirpes, to the lineal descendants then living" of Bendena and Mathilde. Thus, our task with regard to the *inter vivos* trust is to determine whether the Blasdel and Hudson adoptees are lineal descendants of, respectively, Bendena and Mathilde.

The testamentary trusts present a related but distinct legal issue. The first testamentary trust provided income to Bendena for the remainder of her life, and then to her son Francis for the remainder of his life. When Francis died, the *corpus* of the trust was to be divided among and paid over to Francis' "lineal descendants" then living *per stirpes* if those descendants were at least 30 years old. Consequently, in interpreting this trust, we must determine

---

7. In other words, the circuit court ruled that the natural children were entitled to receive terminating distributions from the *inter vivos* trust and *both* the first and second testamentary trusts described *supra*. In light of our ultimate disposition of this appeal, we need not further consider the correctness of that ruling, about which the Blasdel and Hudson adoptees, in their post-trial motion for new trial, observed: "In this regard, it is worthy of note that the Ted Hudson share of Gertrude Jaccard's testamentary trust, if Ted has no lineal descendants, is not directed to the Blasdel natural children, but rather to the Walter M. Jaccard Memorial Trust Fund."

whether the Blasdel adoptees are lineal descendents of Francis. Likewise, the second testamentary trust provided income to Mathilde for the remainder of her life, and then to her son Theodore for the remainder of his life. When Theodore died, the *corpus* of the trust was to be divided among and paid over to Theodore's "lineal descendants" then living *per stirpes* if those descendants were at least 30 years old. Therefore, in interpreting this trust, we must determine whether the Hudson adoptees are lineal descendants of Theodore.[8]

■ "In determining the meaning of a trust provision, the paramount rule of construction is that the settlor's intent is controlling and such intention must be ascertained primarily from the trust instrument as a whole." *First Nat'l Bank of Kansas City v. Hyde,* 363 S.W.2d 647, 652 (Mo. 1962). "It must be remembered · that courts must decide the meaning of a testator by what he said in his will, and not by attempting 'to guess what he meant or what he might have done under certain conditions if not expressed in his will.'" *Brock v. Dorman,* 339 Mo. 611, 98 S.W.2d 672, 675 (1936) (quoting *St. Louis Union*

*Trust Co. v. Hill,* 336 Mo. 17, 76 S.W.2d 685, 687 (banc 1934)). Thus a testator's intent "must be determined by what the will actually says and not by what we might imagine the testator intended to say or would have said if he had decided to further explain his intention." *Gardner v. Vanlandingham,* 334 Mo. 1054, 69 S.W.2d 947, 949 (1934). While it is not inappropriate to resort to outside evidence of surrounding circumstances to identify the beneficiaries, to explain their relationship to the testators, or to show the nature and extent of the testators' holdings, even when such explanatory material has been obtained, we must still look primarily to the language of the will. *Helmer v. Voss,* 646 S.W.2d 738, 741 (Mo. banc 1983).[9]

■ We endeavor to ascertain the settlor's intent at the time of the creation of the trust. *Ratermann v. Ratermann,* 405 S.W.2d 891, 894 (Mo.1966). The law in force when a trust was executed normally governs determination of whether an adopted child is included within the meaning of a described class of a trust's beneficiaries. *Id.; First Nat'l Bank of Kansas City v. Sullivan,* 394 S.W.2d 273, 281 (Mo. 1965).[10] In determining what law was in

---

**8.** To illustrate the distinction, compare *Baker v. Kennedy,* 238 S.W. 790, 791 (Mo.1922) (heirs of the testator were to assume possession of the estate at the death of the life tenant, and to take as the testator's heirs, not as heirs of the life tenant) with *Green v. Irvin,* 309 Mo. 302, 274 S.W. 684, 686–87 (1925) (heirs of the life tenant were to assume possession of the estate at the death of the life tenant, and to take as the life tenant's heirs, not as heirs of the testator; the Court referred to *Baker* as involving a "radically different" situation).

**9.** Although this and many other cases cited herein concern wills, Missouri courts generally use the same rules for construing both trusts and wills. *In re Nelson,* 926 S.W.2d 707, 709 (Mo.App. S.D.1996). *See also* George G. Bogert *et al., THE LAW OF TRUSTS AND*

TRUSTEES § 182, at 70 (Cum.Supp.2003 to rev.2d ed. (1979)); IIA Austin W. Scott & William F. Fratcher, THE LAW OF TRUSTS § 164.1, at 260 (4th ed.1987).

**10.** There is an exception to this general rule, and that is when the maker of the instrument establishing the trust clearly expresses a different intent. For example, *Commerce Trust Co. v. Weed,* 318 S.W.2d 289 (Mo.1958) illustrates the principle that a Missouri testator can, if he likes, expressly tie a will to the law other than that existing at the date of its execution. *Easter v. Ochs,* 837 S.W.2d 516, 517–18 (Mo. banc 1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993). The trusts here do not contain any such language.

force at the time a legal instrument such as a trust or will was executed, "Missouri assumes that testators know and understand the meaning and effect of the terms used in their wills as defined under Missouri law." *Easter,* 837 S.W.2d at 517; *see also Commerce Trust Co. v. Duden,* 523 S.W.2d 97, 99 (Mo.App. W.D.1975); *In re Nelson,* 926 S.W.2d at 709. The makers of the three trusts at issue in this case are, therefore, presumed to have known and intended the legal meaning and effect of the language they employed in the trust instruments at the time they were executed.

Moreover, the law of this state is, and for many years has been, well-settled that absent any ambiguity in the terms of a legal instrument, the intent of its maker, including the intent of a testator or the settlor of a testamentary or *inter vivos* trust, is to be ascertained from the four corners of the instrument without resort to parol evidence as to that intent. *See Housman v. Lewellen,* 362 Mo. 759, 244 S.W.2d 21, 23 (banc 1951); *Trautz v. Lemp,* 329 Mo. 580, 46 S.W.2d 135, 139 (banc 1932); *Duden,* 523 S.W.2d at 99. Thus, Missouri courts do not rely on extrinsic evidence of intent or employ technical rules of construction where the settlor of a trust has unambiguously expressed his or her intent. "Where the language used is clear and of well-defined force and meaning, it must stand as written and extrinsic evidence of what was intended in fact cannot be adduced to qualify, explain, enlarge, or contradict the language." *Hyde,* 363 S.W.2d at 653. Furthermore, because the grantor is presumed to know the legal effect of the language used in the trust instrument, extrinsic evidence, including the grantor's own statements, regarding the grantor's intentions is normally inadmissible. *Id.* at 652–53. "[T]he intentions of the testator must be gleaned

from the written unambiguous will, not from what the testator or the will's scrivener, after execution of the instrument, contrarily declared, either orally or in writing, to be testator's intentions or the meaning of provisions in the will." *In re Estate of Welter,* 598 S.W.2d 618, 619 (Mo. App. S.D.1980) (citing *Gehring v. Henry,* 332 S.W.2d 873, 876 (Mo.1960), and *Crist v. Nesbit,* 352 S.W.2d 53, 56 (Mo.App. W.D. 1961)).

Nor will the courts of this state rewrite a will under the guise of construction. *Boone County Nat'l Bank v. Edson,* 760 S.W.2d 108, 111 (Mo. banc 1988) (citing *Burrier v. Jones,* 338 Mo. 679, 92 S.W.2d 885, 887 (banc 1936)). "The function of the court is to construe the will as written by the testator and not to make or rewrite one for the testator under the guise of construction." *First Nat'l Bank v. Danforth,* 523 S.W.2d 808, 816(Mo.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975). " 'The courts have no right to make a new will for the testator, nor have they the right to say what the testator should have meant to do, nor what words the testator meant to use, but the true province of the court is to ascertain from the will what the testator meant by the words he actually used.' " *Crowson v. Crowson,* 323 Mo. 633, 19 S.W.2d 634, 637 (1929) (quoting *Mo. Baptist Sanitarium v. McCune,* 112 Mo.App. 332, 87 S.W. 93, 95 (E.D.1905)). The underlying reason for this is found in the Missouri statutes requiring wills and trusts to be expressed in writing. *See, e.g.,* §§ 432.010, 456.010, 474.320, and 474.340, RSMo 2000. "To admit parol testimony, when there is no ambiguity, as to the intention of the testator or what he meant by the words used, would in effect repeal the statute requiring wills to be in writing." *Murphy v. Enright,* 264 S.W. 811, 813 (Mo.1924); *see also Lang v. Estorge,* 242 S.W.2d 50, 53

(Mo.1951) (internal quotation marks omitted) ("However clearly an intention not expressed in the will may be proved by extrinsic evidence, the rule of law requiring wills to be in writing stands as an insuperable barrier against carrying the intention thus proved into execution.") Furthermore, in determining whether an ambiguity exists, "courts must look to the language used within the entire instrument, not to the result of the distribution plan." *Edson,* 760 S.W.2d at 111. That is, we "must ascertain the testatrix' intention from the four corners of the will, not from the results to be achieved under a will." *Id.*

We now proceed to apply these legal principles. Initially, we must determine whether, under Missouri law in force at the time the two testamentary trusts were executed in May 1949, the Blasdel adoptees are lineal descendents of Francis and the Hudson adoptees are lineal descendants of Theodore.

Adoption is a juridical act which creates between two persons a relation of purely civil nature similar to that existing between a natural parent and his child. In other words, it is an act by which one person who is not the natural parent of another creates between himself and that other a complex or aggregate of legal relationships, rights, privileges, powers, immunities, etc., which are identical with those which the law creates between a natural parent and his child.

*Niehaus v. Madden,* 348 Mo. 770, 155 S.W.2d 141, 144 (1941). It is now, and was for many years prior to May 1949, the law of this state that a child adopted under Missouri's adoption statutes is taken out of the blood stream of its natural parents and placed, by operation of law, into the blood stream of its adoptive parents:

The Legislature had a right to and did in strong and emphatic language change the blood stream of an adopted child. Under our present statutes an adopted child's relations with its natural parents cease; and by law it becomes the child of its adopting parents *for every purpose* as fully as though born to the adopting parents in lawful wedlock. In other words, the adopted child is taken out of the blood stream of its natural parents and placed, by the operation of law, in the blood stream of its adopting parents, if adopted under the provisions of our present statutes.[11]

*Hill,* 76 S.W.2d at 689 (emphasis in original). Such a child thereby becomes a lineal descendant of his or her adoptive parents:

The Statute of Adoption places the adopted child next in the line of descent from the ancestor, of whom, for the purpose of inheritance he becomes the child and heir, with all the incidents of those relations, including the incident of transmission of the inheritance by his death, and the children of the adopted one would stand in the same line of descent as their parent.

*In re Cupples' Estate,* 272 Mo. 465, 199 S.W. 556, 558 (1917); *see also Shepherd v. Murphy,* 332 Mo. 1176, 61 S.W.2d 746, 749 (1933).

---

11. The Blasdel and Hudson adoptions all took place in states other than Missouri. However, this has no effect on our analysis. *See* § 453.170.1, RSMo 2000 (originally enacted as § 9616b, 1945 Mo. Laws 625) ("When an adoption occurs pursuant to the laws of other states of the United States, Missouri shall, from the date of adoption hold the adopted person to be for every purpose the lawful child of its parent or parents by adoption as fully as though born to them in lawful wedlock, and such adoption shall have the same force and effect as adoption pursuant to the provisions of this chapter, including all inheritance rights.")

Accordingly, we hold that under the terms of the first testamentary trust, the three natural children and the two Blasdel adoptees are Francis' lineal descendents. Likewise, Theodore did not die without any surviving lineal descendants, as found by the circuit court. Rather, under the terms of the second testamentary trust, the four Hudson adoptees are Theodore's lineal descendants. For this reason, the circuit court's judgment in favor of Commerce Bank against the Hudson adoptees for the $6,706.43 in trust income that had been distributed to them by Commerce under the terms of the second testamentary trust prior to the filing of Commerce's petition in this matter must be reversed.

We now turn to the terms of the *inter vivos* trust, which was executed in March 1949. At that time, the law in force in Missouri was (and still is) that adopted children are eligible to inherit as lineal descendants of their adoptive parents' ancestors. That is to say, under the law in force in Missouri when this trust was executed, an adopted child was not only a lineal descendant of its adoptive parents, but also a lineal descendant of its adoptive parents' ancestors, who are also sometimes referred to as the adopted child's "ascendants."

In enacting § 9614, RSMo 1939, the General Assembly declared the law of Missouri to be that from the date of their adoption forward, adoptees were to be considered, *for every purpose*, exactly as if they were the legitimate, natural-born children of their adoptive parents: "When a child is adopted in accordance with the provisions of this article, ... [s]aid child shall thereafter be deemed and held to be for every purpose, the child of its parent or parents by adoption, as fully as though born to them in lawful wedlock." Moreover, in the same statute, the legislature also made it crystal-clear that this included

full rights to inherit from the adoptive parents: "Said [adopted] child ... shall be capable of inheriting from, and as the child of said parents as fully as though born to them in lawful wedlock." *Id.* The General Assembly further provided that adoptive parents were also fully capable of inheriting from their adopted children: "Said parent or parents by adoption ... shall be capable of inheriting from, and as the parents of, said adopted child as fully as though the child had been born to them in lawful wedlock[.]" *Id.* The statute did contain one proviso limiting an adoptee's right to inherit: "*Provided, however,* that neither said adopted child nor said parents shall be capable of inheriting from or taking through each other property limited expressly to heirs of the body of such child or parent by adoption." *Id.* (emphasis in original).

*Robertson v. Cornett,* 359 Mo. 1156, 225 S.W.2d 780 (1949), is instructive in determining the effect of this statute (which was, of course, in effect at the time the *inter vivos* trust was executed in March 1949) on the meaning and effect of the trust's terms. In *Robertson,* the Court held, based on the language of § 9614, RSMo 1939, that a child adopted by the testator's natural-born son was not only a lineal heir of his adoptive father, but also a pretermitted lineal heir of his adoptive *grandfather,* the testator himself. 225 S.W.2d at 784–85. The Court explained: "Sec. 9614, supra, on the subject of *consequences* of *adoption,* in our opinion, makes respondent in effect a *lineal heir* of his adoptive grandfather." *Id.* at 786 (emphasis in original).

In their brief, the natural children concede that under *Robertson,* both the Blasdel and Hudson adoptees clearly qualify as lineal descendants of Bendena and Mathilde under the terms of the *inter vivos* trust. They nevertheless argue that the

law in force when the *inter vivos* trust was executed did not include adoptive grandchildren within the meaning of the term "lineal descendants" because *Robertson* was not decided by the Missouri Supreme Court until December 12, 1949—some nine months after the *inter vivos* trust was executed. We disagree.

First of all, although the Missouri Supreme Court evidently did not have occasion to consider and rule the question presented in *Robertson* until December 1949, it is evident from the Court's opinion that it merely applied Missouri law as it had appeared in the statute books during the preceding ten years. Second, in early 1948, about a year before the *inter vivos* trust was executed, the 64th General Assembly, during its Second Session, enacted changes to § 9614, RSMo 1939 which removed any doubt on that particular question. *See* Vol. II 1947 Mo. Laws 213, 217. The bill (Senate Committee Substitute for S.B. 335), which contained an emergency clause making it effective immediately upon gubernatorial approval "[s]ince the present statutes relating to the adoption of children are inadequate in some respects," was signed by the Governor on May 21, 1948, and went into effect immediately thereafter. *Id.* at 218, 219; Harold S. Cook & Fred A. Eppenberger, *The New Adoption Act,* 4 J. Mo. BAR 228, 228 (Sept. 1948).[12] While many of the changes were merely non-substantive grammatical corrections and clarifications, as they pertain to this case, two were most certainly not. The legislature repealed the proviso set forth *supra* and replaced it with the following: "Said adopted child shall be capable of inheriting from and taking through his

parent or parents by adoption property limited expressly to heirs of the body of such parent or parents by adoption." Vol. II 1947 Mo. Laws at 217. The General Assembly also added a new sentence, which made it quite clear that all of the revised § 9614's provisions applied to both minor *and* adult adoptees: "The word 'child' as used in this section, shall, unless the context hereof otherwise requires, be construed to mean either a person under or over the age of twenty-one years." *Id.*[13]

Contemporary legal commentators immediately recognized that to the extent there had previously been any doubts as to the ability of adopted children to inherit from ancestral adoptive kindred as members of their extended "blood stream," the 1948 amendments conclusively dispelled them:

> [T]he Legislature must have intended the broad interpretation of the [1939] statute to continue as the law of Missouri, freed, by the removal of the proviso, from the sole exception thereto. Accordingly, then, it seems clear beyond question that an adopted child now has every right of inheritance from or through its adoptive parents, without limitation, which it would have had if it were their blood child.

Paul Taub, *Adopted Child's Inheritance Rights Under Missouri Law,* 5 J. Mo. BAR 69, 74 (May 1949); *see also Weed,* 318 S.W.2d at 297–98.

To accept the natural childrens' argument, we would have to conclude, as a matter of law, that both the settlors and a competent Missouri lawyer who drafted a

---

12. The following year, § 9614 was codified as § 453.090, RSMo 1949. With the exception of a few minor changes made in 1982, the version of § 9614 enacted in 1948 currently appears as § 453.090, RSMo 2000.

13. Of course, long before the 1948 amendments to § 9614, Missouri law provided that both adults and minors could be validly adopted. *See, e.g., In re Moran's Estate,* 151 Mo. 555, 52 S.W. 377, 378 (1899); *Hill,* 76 S.W.2d at 689.

complex will and multiple trusts for them ten years after the enactment of § 9614, RSMo 1939, *and* less than a year after the General Assembly's May 1948 amendments to § 9614 cannot be charged with constructive knowledge of the effect of those statutes on Missouri law pertaining to the inheritance rights of adoptees (and in particular, *adult* adoptees). In light of the circumstances then present, and the treatment of § 9614 in the cases that subsequently arose requiring its application, we decline to draw such a conclusion, and hold that the settlors here are conclusively presumed to have known of the legal effect of those statutes on the estate and trust law of this state. Moreover, absent the clearest of evidence to the contrary, we will not assume that Gertrude intended the term "lineal descendants" to include adoptees in the class of beneficiaries in her will, but did not intend them to be included among the beneficiaries of the *inter vivos* trust, which she had executed just two months earlier.

The natural childrens' next argument in defense of the circuit court's ruling is that the structure of the trusts' distribution schemes demonstrates that the settlors intended to exclude adoptees from the class of lineal descendants. In fact, however, the language of the third testamentary trust described *supra* demonstrates the exact opposite, and refutes the natural childrens' claim that the trusts' overall distribution schemes indicate that the settlors intended that their "lineal descendants" include only natural-born children and that the settlors were " 'blood line' minded in constructing the dispositive provisions" of the trust instruments.

First, as mentioned earlier in this opinion, at the time she executed the trust instruments, Gertrude *herself* had mothered an adopted child of her own—namely, Elizabeth "Betty" Jaccard. As a result, she must have been acutely aware of the possibility that her nephews Francis and Theodore might also choose to adopt at some later date. Indeed, in the *Weed* case, the Missouri Supreme Court held that this would have been an entirely legitimate inference even if Gertrude had never mothered an adopted child herself:

As heretofore stated, testator intended to create a contingent remainder which would vest in his lineal descendants on the date of the termination of the trust. At the time of making his will he knew that that date was apt to be many years in the future and that marriages, deaths, births and perhaps adoptions would likely occur before the termination date, which events would change the personnel of the group that would eventually make up the class designated as 'lineal descendants.'

318 S.W.2d at 298.

Second, as provided in the express terms of third testamentary trust discussed *supra*, Gertrude had established "The Betty Jaccard Memorial Trust for Crippled Children" in her will before the untimely death of her sister Adah. In our view, this shows that the memory of Betty (who was given her adoptive mother Gertrude's middle name by her parents) was still very dear to Gertrude some 20 years after Betty's death in 1929. If Gertrude was singularly "blood-line minded," as claimed by the natural children, we think it rather obvious that she would not have established a testamentary trust fund in loving memory of an adopted child.

For the reasons discussed above, we hold that under the terms of the *inter vivos* trust, the three natural children and the two Blasdel adoptees are lineal descendants of Bendena, and the four Hudson adoptees are lineal descendants of Mathilde. In making this determination, we readily acknowledge the natural children's

observation that when " 'construing the rights of an adopted child to take under a will, it should be borne in mind that it is not a question of the right of an adopted child to inherit, but simply a question of the testator's intention . with respect to those who are to share in his estate.' " *Weed*, 318 S.W.2d at 298 (quoting 1 Am. Jur. *Adoption of Children* § 64, at 665 (1936)). Indeed, our Supreme Court has said that while Missouri's adoption laws are to be considered in determining a testator's intention with respect to whether an adoptee shall be included or excluded from a designated class of beneficiaries, that intention may be altogether different from that which Missouri adoption law provides, and if so, will be respected as long as it does not violate public policy. *Sullivan*, 394 S.W.2d at 281.

We must, nevertheless, reject the natural childrens' argument, because if the settlors here had any such contrary intention, they failed to manifest it in the language they used in the instruments creating the trusts. In view of the words employed by the settlors in the instruments creating the trusts and the law in force at the time they were executed, the trusts at issue here cannot be characterized as ambiguous. That is to say, the phrase "lineal descendants," which the settlors used to describe the class of intended beneficiaries in all three trusts, clearly and unambiguously included both natural children and adult adoptees, and no contrary intention was manifested within the instruments themselves. When the terms of a will are unambiguous, the testator's intention "must be determined from the whole will and by what the will actually says, that is, the intent of the testator as disclosed by *the words of the will itself* . . . The testator must be presumed to have intended the legal effect of the language used in the will. This is on the theory that the testator is presumed to know the law." *Thom-*

*as v. Higginbotham*, 318 S.W.2d 234, 237 (Mo.1958) (emphasis added); see also *Pommer v. Bushnell*, 316 Mo. 1016, 292 S.W. 417, 418 (1927) ("[W]e are not permitted to ascertain that intention by conjecturing what he ought to have done or might have intended to do. We must gather his intention from the language which he used. It is not what he may have intended to say in the will, but what he said. It is the will itself from which we gather that intention.") We reach the same conclusion as the Missouri Supreme Court in *Crowson*:

> In so far as the testator expressed his intention, he did so plainly and unequivocally, and, in our opinion, there is nothing in the language used, nor the surrounding circumstances, to justify the conclusion that he intended to say more. Counsel reach that conclusion by speculation. We are not permitted to speculate as to the testator's intention.

19 S.W.2d at 637. The point is granted.

### *Davis v. Neilson*

Although we have granted the appellants' first point relied on, which requires that we reverse significant portions of the circuit court's judgment, we must also address their second point, because it raises important issues regarding the legal framework underlying its conclusions—which it based on our decision in *Davis v. Neilson*, 871 S.W.2d 35 (Mo.App. W.D. 1993). In their second point relied on, the Blasdel and Hudson adoptees argue that the circuit court prejudicially erred because it incorrectly declared, interpreted, and applied the law as stated in *Davis*, in that it failed to apply the familial presumption in favor of including stepchildren and failed to credit what the adoptees claim was the "great weight" of evidence demonstrating that they had sufficient familial connections to be included in the gift class

along with the natural children. In response, the natural children contend that the circuit court properly applied *Davis* in determining that the adult adoptees in this case did not enjoy a legitimate parent-child relationship with their adoptive fathers. Ultimately, however, we need not decide whether the circuit court correctly interpreted and applied *Davis*, because it should not have been relied on, at least in this case.

The facts in *Davis* were hard—very hard. The testatrix, Marie Giffey, executed her will in 1968. It directed that her estate, after other specified bequests, was to be placed in a trust and divided into two unequal parts. 871 S.W.2d at 36. One-third of the estate was to benefit the children of her son, Hunter Davis, and the other two-thirds were to benefit Robert Davis Neilson, her grandson. *Id.* The will provided that Neilson was to receive income payments from his portion of the trust until that portion was terminated, which was specified to be either when Hunter Davis died or when Neilson attained age 40, whichever occurred last. The will also provided that upon termination of Neilson's portion of the trust, the remaining principal and accumulated income was to be distributed, " 'absolutely and free and clear of all trusts, to the issue, per stirpes, of' " Neilson. *Id.* The will further specifically defined "issue" to include " 'lawful issue' " and " 'an adopted child or children.' " *Id.* at 36, 38. Marie Giffey died in 1977, and Hunter Davis was evidently also no longer alive when Neilson, who had two natural-born children by his former wife, reached age 40.[14] Three to four months before reaching his fortieth birthday, Neilson adopted six adults, all of whom retained their surnames—his legal secretary and her son, his nephew, and

three friends. *Id.* at 36–37. None of the adoptees lived with Neilson in any sort of family arrangement, four of them were older than Neilson, and only one, his secretary, had received any previous financial support from him. *Id.* at 37.

After Neilson's fortieth birthday, the trustee refused to distribute any portion of the residuary trust estate to his six adult adoptees and filed a declaratory judgment action seeking a determination as to whether they should be included along with Neilson's two natural children in the class of beneficiaries comprising his "heirs." *Id.* Neilson's natural children answered that they were Neilson's only proper heirs because the adoptions violated Giffey's intent. The adult adoptees asserted that, because the terms of the will were clear and unambiguous, they should be declared "heirs" along with Neilson's natural children. Later, the natural children requested permission to amend their pleadings to allege fraud by Neilson. *Id.* The circuit court refused to permit the amendment and entered summary judgment in favor of the adoptees, holding that Missouri recognizes adult adoptions as valid regardless of an adopter's motive and that Giffey's will unambiguously included Neilson's adult adoptees as his "heirs." *Id.* The circuit court therefore ordered that the trust proceeds be distributed both to Neilson's two natural children and his six adult adoptees. *Id.* at 36.

The natural children appealed, and this court reversed and remanded for further proceedings. *Id.* at 39. After observing that Missouri law, like that of 40 other states, permits adult adoptions and places no limitations on the age of a child to be adopted, *id.* at 37–38, the court concluded that "in deciding the effect of an adult adoption on the construction of a testa-

---

**14.** At that time, the value of Neilson's two-thirds share of the trust estate was variously estimated at between $1 million and $2.5 million. *Id.* at 37.

mentary instrument," Missouri will neither presumptively include nor exclude adult adoptees in class gifts to children, but will allow "exceptions to presumptive exclusion or inclusion depending on particular circumstances." *Id.* at 38. The court then held that based on the express language of the testatrix' will, it had "no doubt that [she] intended to include adopted children in the class to receive the residuary of her trust," and that she also intended to include adults within the provision for " 'an adopted child or children.' " *Id.*

 That would normally have ended this court's inquiry in favor of Neilson's adopted children. However, the *Davis* court then proceeded to hold that a question left "[u]nanswered" was whether, in leaving property to her grandson's "issue," the trial court "should have presumed Giffey to have intended to include within the gift class the particular adults adopted by Neilson—persons with whom Neilson had no apparent prior family relationships." *Id.*[15] It did this on the basis of a law review article, which, the court was convinced, answered that question:

> '[C]ommon sense tells us that a donor would normally expect anyone partaking of his bounty to be a true family member and not just some willing adult adopted for the purpose of reducing or defeating a gift-over to others.' Jan Ellen Rein, Relatives by Blood, Adoption, and Association: Who Should Get What and Why, 37 Vand. L.Rev. 711, 758 (1984). Common sense tells us that Giffey, by inserting adopted children

into the class she described as Neilson's 'issue,' intended to include only individuals with some familial bond to her family—individuals to whom Neilson felt a familial bond of love and duty, such as adult stepchildren.

*Id.* (internal footnote omitted). After noting that "[r]estricting the presumption of inclusion to only individuals who are the natural object of the testator's bounty should be sufficiently effective in sifting the bounty hunters from the class," *id.* at 39, the court directed the trial court, on remand, to consider extrinsic evidence concerning several factors bearing on "whether the persons adopted by Neilson have the familial ties we conclude are necessary," including "whether the adopter has assumed responsibility for the adoptee; whether the adoptee has taken the adopter's surname; whether the adoptee entered the adopter's home, and, if so, at what age; the length of time the adopter and adoptee lived together; and the nature and extent of adopter's and adoptee's parent-child relationship." *Id.*[16]

Applying the *Davis* standard, the circuit court in this case looked beyond the language of the trust instruments themselves by receiving into evidence and passing on the weight and credibility of a host of parol evidence, including a 1962 letter to Bendina from the attorney who prepared the trusts, as well as conflicting testimony concerning the motives behind the Blasdel and Hudson adoptions and the extent to which the Blasdel and Hudson adoptees

---

**15.** However, as the Missouri Supreme Court explained in *Weed,* the general rule is that a testator is not required to have "a specific intent that any particular individual should share in the distribution of the trust assets." 318 S.W.2d at 298.

**16.** A large portion of this non-exclusive list of factors came directly from Professor Rein's Vanderbilt Law Review article. *See* Rein, 37

Vand. L.Rev. at 765. For a more comprehensive analysis of the many cases in this general area of the law, see Jay M. Zittner, Annotation, *Adopted child as within class named in testamentary gift,* 36 A.L.R.5th 395 (1996) and Jay M. Zittner, Annotation, *Adopted child as within class named in deed or inter vivos trust instrument,* 37 A.L.R.5th 237 (1996).

had established the requisite familial relationship with their adoptive parents to be included in the gift class under *Davis*. This was error for two reasons. First, *Davis* involved an extraordinary set of factual circumstances, in which five of the six adult adoptees were evidently total strangers to the family unit with no apparent familial ties whatsoever to anyone involved in the case prior to being adopted. Moreover, those individuals were adopted at the eleventh hour, only a few months before terminating distributions from the trust were pre-scheduled to occur.

The case at bar presents a far different scenario, as the adopted adults here (the Blasdel and Hudson adoptees) all had self-evident prior familial ties since they were all stepchildren who had been mothered by the wives of Francis and Theodore during a previous marriage. Since their status as stepchildren (and, therefore, as non-strangers to the family) gave them sufficient prior familial ties for presumptive inclusion in the gift class, the *Davis* analysis was not only unnecessary, but inappropriate. Moreover, the adult adoptees here were all adopted one or more *decades* before terminating trust distributions.

Second, subsequent developments in the law have changed the manner and need for application of the *Davis* approach. That is to say, *Davis* was decided at a time when tort and other remedies to preclude "sham adoptions made solely to obtain benefits from a decedent's trust" (4C Francis M. Hanna, Missouri Practice: Trust Code and Law Manual § 2:32, at 313 (2004)) were in their infancy and, more importantly, were not even part of the argument on appeal in *Davis*. Thus, the court in *Davis* fashioned what could be termed an equitable approach for use in those rare cases where there was clear and convincing evidence that obvious shams were being perpetrated in an effort to achieve a seemingly legal but absurd distribution based on the plain and unambiguous language of the will or trust.

The need for this equitable remedy is almost non-existent today because of the development of a tort remedy that can effectively be used to preclude what *Davis* described as "bounty hunters," *e.g.*, those who enter into sham adult or minor adoptions solely to create or increase the class of takers under an ancestor's unambiguous will or trust in order to reduce or defeat a gift-over to others. 871 S.W.2d at 39. Section 774B ("Intentional Interference With Inheritance or Gift") of the Restatement (Second) of Torts (1979) provides:

> One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

Actions for tortious interference with expectancy of inheritance or gift under § 774B were first recognized as viable in Missouri in *Hammons v. Eisert*, 745 S.W.2d 253 (Mo.App. S.D.1988). In *Hammons*, the court held that the beneficiary of a revocable written trust had a cause of action, after the death of the settlor, against a person who, by the exercise of undue influence, induced the settlor to revoke the trust, thereby diverting all or part of the trust assets to another and preventing the beneficiary from receiving that which he otherwise would have received. *Id.* at 257, 258 (citing § 774B). By the time *Davis* was decided in 1993, actions for tortious interference with expectancy of inheritance or gift were still few and far between. And, the tort was neither pled nor argued by the parties in *Davis*, so it is readily apparent why the court did not address the issue. Since *Davis*, however, more cases have defined and explored the parameters of the tort.

For instance, in *Brown v. Kirkham*, 23 S.W.3d 880, 885 (Mo.App. W.D.2000), this court noted that "Missouri courts clearly recognize the cause of action of tortious interference with expectancy of inheritance." And commentators have likewise explored the subject: "Even though this action is in its infancy in Missouri, it is anticipated that creative litigants will soon learn of its existence and will expand its parameters and use when there is an appropriate set of facts and circumstances." II Thomas L. Lasley & John S. Gordon, *Missouri Estate Administration* § 17.48, at 17–39 (MoBar 4th ed.1999). And, as will be discussed *post,* this prediction is already becoming reality as there are now numerous reported Missouri cases dealing with the subject. In the narrow and rather unusual class of cases like the one at bar, tortious interference with expectancy of inheritance or gift is the preferred remedy and nearly always will be adequate. For this reason, the *Davis* approach is generally unnecessary,[17] except possibly in the rarest of cases involving peculiar circumstances under which a successful tort action for interference with expectancy of inheritancy or gift under § 774B clearly would not provide an adequate remedy.

### Attorney's Fees

■ In their third point relied on, the Blasdel and Hudson adoptees assert that the circuit court erred in failing to award them their reasonable attorney's fees and expenses because they were entitled to such an award in that a beneficiary who litigates a matter concerning the proper construction of a trust is entitled to have such fees and costs paid from the trust estate before terminating distributions therefrom and they requested fees and expenses in their answer. The natural children argue that there was no error since during trial, the adoptees failed to present any evidence whatsoever concerning either the amount or the reasonableness of the fees or costs claimed by the adoptees, and the issue of attorney's fees and costs was not even mentioned in the adoptees' post-trial motions and is being raised for the first time on appeal.

■ We agree with the natural children. In an action for interpretation of a trust, we will not disturb a circuit court's decision denying a beneficiary's request for attorney fees unless it has abused its discretion. *Thatcher v. Lewis*, 335 Mo. 1130, 76 S.W.2d 677, 684 (1934). Although trial courts deciding questions of trust interpretation have discretion to reopen a case, on motion by a putative beneficiary, to permit presentation of further evidence on the amount and reasonableness of the

17. This is evident by virtue of the fact that *Davis* has only been cited once in the more than 10 years since it was decided. Even in that case, *Boatmen's Trust Co. v. Conklin*, 888 S.W.2d 347 (Mo.App. E.D.1994), the *Davis* approach was entirely unnecessary to a proper disposition of the case excluding the adult adoptees from taking under the will in question. The plaintiffs in *Conklin* were two adults (one 37 and the other 42), both of whom were adopted by the testator's grandson in 1978, some 66 years after the testator's death in 1912. *Id.* at 349. The will in question, which was executed in 1911, gave a remainder interest to the "issue" of the testator's daughter. *Id.* at 348–49. The court held that since the well-known meaning of the term "issue" when the will was executed in 1911 was "a child of the blood," the two adults adopted by the testator's grandson were not members of the gift class and could not take as "issue" of the testator's daughter, even though the grandson himself, who was the testator's daughter's natural son, qualified under those terms. *Id.* at 351. The *Conklin* court cited *Davis* only to meet the adoptees' argument that the trial court erred in admitting and relying on, in its decision, certain extrinsic evidence of the grandson's motives for adopting them since such evidence was inadmissible in determining and effectuating the intent of the testator. *Id.* at 354–55.

attorneys' fees and expenses to which the movant may be entitled, *St. Louis Union Trust Co. v. Kern*, 346 Mo. 643, 142 S.W.2d 493, 500 (1940), under the circumstances here, the Blasdel and Hudson adoptees have failed to establish that the circuit court committed an abuse of discretion. *See id.* Point denied.

### Tortious Interference With Inheritance Expectancy

In their fourth and final point relied on, the Blasdel adoptees lodge a variety of complaints about the propriety of the circuit court's judgment against them and in favor of the natural children on the natural childrens' cross-claim for tortious interference with inheritance expectancy.[18] First, they argue that the judgment must be reversed since a claim for tortious interference with inheritance expectancy "may not be made where it is duplicative of probate remedies or where probate remedies have not first been exhausted," citing *McMullin v. Borgers*, 761 S.W.2d 718 (Mo.App. E.D. 1988). We disagree. Although Missouri courts have limited the circumstances under which a plaintiff has standing to bring a tortious interference action, under those present in this case, there was no error.

In *McMullin*, the Eastern District held that when a disputed will has been admitted to probate but the plaintiff consciously chooses to file an action for tortious interference with inheritance expectancy in lieu of a will contest, a tortious interference action will not lie. *Id.* at 719–20. The court in *McMullin* gave three reasons for this rule. First, "[w]here the alleged tort involves superseding one will with another, such an action would offend the probate code by requiring both the effective revocation of an accepted will and the probate

of a rejected will." *Id.* at 719. Second, "[a]llowing an action for tortious interference in a situation such as this would merely encourage plaintiffs to forego the proper remedy of a will contest based on undue influence for the more lucrative damage options available in a tort action." *Id.* at 720. Third, under such circumstances a successful will contest "provides essentially the same remedy and prevents any additional damages[.]" *Id.* The Eastern District followed *McMullin* in *Williams v. Bryan, Cave, McPheeters, McRoberts*, 774 S.W.2d 847 (Mo.App. E.D. 1989), where it held that a negligence action for damages resulting from an attorneys' alleged negligence in drafting a testatrix's second will did not lie where a separate action contesting that will was still pending. Similarly, in *Smith v. Chatfield*, 797 S.W.2d 508 (Mo.App. W.D.1990), this court cited *McMullin* and *Williams* in support of its holding that when a plaintiff has already been afforded full relief after successfully prosecuting a will contest, he may not pursue a subsequent action for tortious interference with inheritance expectancy. *Id.* at 510.

Several years later, in *Brandin v. Brandin*, 918 S.W.2d 835 (Mo.App. E.D.1996), the Eastern District extended *McMullin*, holding that, as Missouri recognizes actions to set aside trusts as the products of undue influence, "the court's policy behind requiring plaintiffs to seek redress through other available and adequate forums, as it does with respect to wills in the probate court, correctly and logically extends to requiring plaintiffs to seek redress through courts of equity for challenges to express trusts." *Id.* at 840. Taking pains to explain that each of the three reasons it originally gave in *McMul-*

---

**18.** The Blasdel adoptees do not appeal the denial of their similar counter cross-claim against the natural children.

*lin* were fully applicable to the case before it, *id.* at 839–841, the Eastern District proceeded to hold that a tortious interference action does not lie where the plaintiff chooses to file such an action in lieu of a suit seeking to set aside a trust or will on the grounds of undue influence. *Id.* at 840. "Here, the children had an adequate remedy at law and in equity had they properly filed a will contest and a trust contest." *Id.* Importantly, the court distinguished *Hammons* as a case where "the plaintiffs had no other remedy available to them .... [and] had no choice but to maintain a tortious interference action to compensate their loss." *Id.*

Thereafter, in *Brown v. Kirkham*, 926 S.W.2d 197 (Mo.App. W.D.1996), this court also extended the rationale of *McMullin*, explaining that "the same principle applies where a petition for discovery of assets is available under § 475.160 [RSMo 1994]." *Id.* at 201. We therefore held that a plaintiff who had failed to file a petition for discovery of assets in the probate court seeking a determination of the title and right to possession of the real property at issue was not entitled to maintain an action for tortious interference with inheritance expectancy. *Id.* at 198–99, 201.

The most recent Missouri case discussing a plaintiff's standing to bring a claim for tortious interference with inheritance expectancy is *Graham v. Manche*, 974 S.W.2d 580 (Mo.App. E.D.1998). In *Graham*, the friend of a testator sued persons associated with the testator for civil conspiracy and tortious interference with his expectation of an inheritance from the testator. *Id.* at 581. The circuit court granted summary judgment against the plaintiff, James Graham, ruling that he should have sought recovery from the probate court in the form of a discovery of assets action and/or equitable relief through a constructive trust, rather than pursuing

actions for tortious interference and civil conspiracy, *id.* at 581 & n. 1, but the Eastern District reversed and remanded for trial. *Id.* at 585.

The *Graham* court summarized the state of the law as follows:

In the wake of *McMullin*, Missouri courts have not allowed claims for tortious interference with an inheritance expectancy unless the plaintiff attempted to obtain an adequate remedy in probate proceedings or show the impossibility of obtaining an adequate remedy in such an action. If a plaintiff fails to either attempt recovery in probate or show that it is impossible to recover in probate, a subsequent tort action in a non-probate division of the circuit court is considered a collateral attack upon the authority and jurisdiction of the probate division; and which is strictly forbidden.

*Id.* at 583 (citing Dennis D. Reaves, *Tortious Interference With an Expected Gift or Inheritance*, 47 J. Mo. Bar 563, 565 (Oct.-Nov.1991)). Distinguishing all of the prior Missouri cases discussed above, the court proceeded to hold that "[t]he reasoning applied in [those cases] does not prevent Graham's action for tortious interference." *Id.* at 584. The court explained that Graham could not have received relief in probate court by filing a will contest since he was not related to the testatrix and did not fall within the definition of an "interested person" authorized to bring a will contest under § 473.083.1, RSMo 1994. *Id.* "Therefore, there is no encroachment on the policy supporting pertinent litigation to be heard in the probate court nor is there a collateral attack of the probated will." *Id.* Accordingly, the court held that summary judgment on Graham's tortious interference action was improper inasmuch as he "could not have been afforded adequate relief in the probate court." *Id.*

The same rationale applies to the instant appeal. This case is neither a will contest not a trust contest, and as such does not involve collateral attacks on a trust or probated will, or allegations that the trust instruments at issue were not, in fact, the ones actually executed or intended by the settlors. Rather, it is a declaratory judgment action brought by a trustee, who sought the circuit court's determination as to the trusts' proper construction, and in which aggrieved rival claimants attempted to obtain an adequate remedy, both by arguing for different constructions of the trusts and bringing competing cross-claims for tortious interference as part and parcel of the same action. Thus neither the natural children nor the Blasdel adoptees forewent a proper remedy in probate court in favor of filing their respective tortious interference actions. Indeed, as we noted *supra*, the *Davis* approach is only available when a claim for tortious interference cannot provide an adequate remedy. And, finally, in light of our disposition of this case on appeal, it cannot be said that the trust construction process would have provided essentially the same remedy as that available in an action for tortious interference with inheritance expectancy. As none of the reasons given by the Eastern District in *McMullin* apply here, neither does the rule announced in that case or the cases decided after it. *See Graham,* 974 S.W.2d at 584.

Next, the Blasdel adoptees argue that a judgment for a plaintiff on a tortious interference claim cannot be sustained on appeal absent proper pleading and proof that the defendant engaged in conduct traditionally considered tortious or wrongful in itself (such as fraud, duress, defamation, undue influence, or abuse of fiduciary duty) with the intent to prevent the plaintiff from receiving an inheritance he or she would otherwise have received. In this, they are correct. "[T]he liability stated in this Section is limited to cases in which the actor has interfered with the inheritance or gift by means that are independently tortious in character. . . . In the absence of conduct independently tortious, the cases to date have not imposed liability under the rule stated in this Section." RE-STATEMENT (SECOND) OF TORTS § 774B cmt. c, at 58–59 ("Tortious means"); *see also Hammons,* 745 S.W.2d at 257; *Brandin,* 918 S.W.2d at 837. Citing *Misischia v. St. John's Mercy Medical Center,* 30 S.W.3d 848, 864 (Mo.App. E.D.2000), the Blasdel adoptees further argue that the natural children failed to make such a showing, because their proof at trial established only that a conspiracy had occurred, which is not, in and of itself, a tortious act. We disagree. In relevant part, the circuit court's findings on the natural childrens' cross-claim were as follows:

> This court further finds that defendants Durland and Jackson [*i.e.,* the Blasdel adoptees], together with their mother, Ann Blasdel, engaged in a scheme to influence [Francis] Blasdel to adopt defendants Durland and Jackson in the belief by [Francis] Blasdel that his natural children, Barbara Blasdel Alexander and Robert H. Hudson would not be deprived of their entitlements under the trusts at the expense of his natural son, William P. Blasdel, thus significantly reducing the amount which would be distributable to said natural children from the trusts. The court further finds that said scheme was fraudulent and was an intentional act interfering with said natural children's expectancy of inheritance.

These findings clearly demonstrate [19] that the circuit court correctly applied the law

---

**19.** The circuit court noted that its resolution of this phase of the case turned on its assess-

and did not, as claimed by the Blasdel adoptees, rely merely on the existence of a conspiracy in reaching its conclusion that they were guilty of having tortiously interfered with the natural childrens' expectancy of inheritance or gift from the various trusts.

We now consider the Blasdel adoptees' third and final argument in support of their fourth point relied on. As noted *supra*, the circuit court entered judgment for the natural children on their crossclaim that the Blasdel adoptees were guilty of tortious interference with the natural childrens' inheritance expectancy, but assessed the natural childrens' actual and punitive damages at $0 since they presented no evidence on the issue of damages. This being the case, the Blasdel adoptees argue, the circuit court's judgment must be reversed, since proof of damages is a required element of an action for tortious interference with inheritance expectancy. We agree that the judgment must be reversed, but remand to give both the natural children and the Blasdel adoptees an opportunity to present whatever evidence of damages (or lack thereof) they can muster.

 Damages are a required element in an action for tortious interference with inheritance expectancy. "An important limitation upon the rule stated in this Section is that there can be recovery only for an inheritance or gift that the other would have received but for the tortious interference of the actor." RESTATEMENT

(SECOND) OF TORTS § 774B cmt. d, at 59 ("Cause of loss"). A § 774B claimant has the burden of proving both the existence and the extent of the lost expectancy. *Morrill v. Morrill*, 712 A.2d 1039, 1042 (Me.1998). The circuit court made the following findings on the issue of damages:

> Although it is clear that adoptees Durland and Jackson conspired with their mother to reduce the distributive shares of the natural children, no evidence was adduced by said [natural] children concerning the damages they sustained. Consequently, no damages can be awarded to them.

> \* \* \*

> Judgment is entered in favor of [the natural children] and against [the Blasdel adoptees] on Count I of the ... natural children's cross-claim that the adoptees were guilty of tortious interference with their inheritance. Actual and punitive damages are assessed at zero.

In their brief, the natural children do not deny that they failed to present the evidence of damages the circuit court found to be lacking. However, they argue that this is of no real consequence since they were successful in convincing the circuit court that under the *Davis* standard, neither of the two Blasdel adoptees were entitled to receive any trust assets whatsoever. As a result, they say, the circuit court's award of $0 in damages properly reflects the fact that, as a matter of law, no damage resulted from the tortious in-

---

ment of the credibility of the witnesses before it and the weight it decided to give to their testimony. "In a judge-tried case, credibility of the witnesses and the weight to be given their testimony are matters for the trial court, which is free to believe none, part, or all of the testimony. We do not substitute our judgment for that of the trial court on credibility issues." *Norris v. Nationwide Mut. Ins. Co.*, 55 S.W.3d 366, 369 (Mo.App. W.D.2001) (in-

ternal citation omitted). In their briefs, the parties have provided us comprehensive and accurate summaries of the extensive evidence presented to the circuit court on this issue. After carefully reviewing the record, we are satisfied that the court's findings here are amply supported by competent and substantial evidence, and are not against the weight of the evidence.

terference committed by the Blasdel adoptees, thereby making any error as to its finding of liability harmless. We agree. *See Lourdes College v. Bishop*, 94 Ohio Misc.2d 51, 703 N.E.2d 362, 371 (Ct. Comm. Pleas 1997).

This leaves the question of whether the natural childrens' cross-claim for tortious interference with inheritance expectancy should be reversed outright or reversed and remanded for a new trial solely on the issue of damages. Anticipating the possibility that this court might reverse the circuit court's ruling that the Blasdel adoptees were not entitled to a distribution of any trust assets under the *Davis* standard, the natural children argue that should this occur, an outright reversal without remand on their tortious interference claim would be inappropriate since they established all of the required elements of the action except damages, and could provide evidence of damages on remand. Again, we agree.

 "An appellate court should reverse a plaintiff's verdict without remand only if it is persuaded that the plaintiff could not make a submissible case on retrial. The preference is for reversal and remand." *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 846 (Mo. banc 1997) (internal citation and quotation marks omitted). As the Missouri Supreme Court observed in *State ex rel. Division of Family Services v. Standridge*, 676 S.W.2d 513 (Mo. banc 1984):

> The furtherance of justice requires [that] a case shall not be reversed without remanding unless the appellate court is convinced the facts are such that a recovery cannot be had. 'It is a settled practice of appellate procedure that a case should not be reversed for failure of proof without remanding, unless the record indicates that the available essential evidence has been fully presented, and that no recovery can be had in any event. This rule is pertinent where the record indicates that other and additional evidence might be adduced in support of plaintiff's action and enable him to make a submissible case.' Because the evidence does not establish that plaintiff could not make a submissible case against defendant if the evidence were fully developed, we decline to reverse and direct the entry of a verdict for defendant. It is appropriate to remand the case for a new trial in which the possibility for a recovery by the plaintiff will remain if sufficient evidence is produced.

*Id.* at 517 (internal citations omitted). "This alternative is available even though a plaintiff has not made a submissible case. In fact, where a plaintiff has by mistake or inadvertence failed to prove up a claim in a situation where the proof seems to have been available, we have no alternative but to reverse the judgment and remand the case for the reception of additional evidence." *Union Sav. Bank v. Cassing*, 691 S.W.2d 513, 515–16 (Mo.App. W.D.1985) (internal citation omitted). In particular, this court has previously applied this principle of appellate procedure in cases where, as here, a plaintiff has obtained a judgment in his favor on the issue of liability, but neglected to present sufficient evidence of damages for the judgment to be sustained on appeal. *See, e.g., Boyd v. Lollar*, 985 S.W.2d 403, 406 (Mo.App. W.D. 1999); *Franklin v. Farmers Mut. Ins. Co.*, 627 S.W.2d 110, 113 (Mo.App. W.D.1982).

 Accordingly, the natural childrens' failure to introduce evidence of damages at trial requires reversal of the judgment in their favor for failure to prove an essential element of their cause of action. However, the record indicates that the evidentiary deficiency requiring reversal is completely curable on remand. The circuit court's judgment in favor of the natural children

on their claim for tortious interference with inheritance expectancy is, therefore, reversed and remanded to the circuit court for retrial solely on the issue of damages.

### Rulings on Motions Taken With the Case

 Pursuant to Western District Local Rule XXIX, the Blasdel and Hudson adoptees moved for an award of $42,000 in attorney's fees and expenses in connection with the prosecution of this appeal, requesting that the award be paid from the trust estates before terminating distributions are made.[20] The natural children vigorously oppose the motion, arguing that it does not contain sufficient detail for this court to be able to determine what portion of the $42,000 claimed was incurred to litigate trust construction issues on appeal, as opposed to work on collateral legal issues not properly chargeable against the trust estate. They also argue that the motion contains insufficient information for this court to decide whether that portion, once determined, would be reasonable. Finally, the natural children claim that an award of attorney's fees and expenses in *any amount* is unjustified since both the action below and the appeal prosecuted by appellants were "capricious, unwarranted, and in bad faith." As this is clearly not the case, and since at least some portion of the claimed sum of $42,000 is properly recoverable by appellants from the trust estates,[21] the motion is granted and the matter is remanded to the circuit court for a hearing, during which appellants are to provide the necessary additional details for the circuit court to determine the proper amount to which they are entitled. *See Mercantile Trust Co. v. Muckerman*, 377 S.W.2d 355, 361 (Mo.1964); *Conklin*, 888 S.W.2d at 355–56.

The natural children also filed a motion to strike Commerce Bank's brief on the ground that, as a trustee, Commerce has a fiduciary duty to remain neutral, and it had failed to do so based on the arguments advanced in its brief. In light of our disposition of the appeal, which is not based on those arguments, the motion is overruled.

### Conclusion

We hold that under the terms of the first testamentary trust, the three natural children and the two Blasdel adoptees are lineal descendents of Francis. Under the terms of the second testamentary trust, the four Hudson adoptees are lineal descendants of Theodore. Moreover, we hold that under the terms of the *inter vivos* trust, the three natural children and

20. The $42,000 figure is based on the terms of a contract between counsel for the appellants and his clients, which was presented to us as part of the motion. However, such a contract is not, in and of itself, controlling as to the amount of attorney's fees which are allowable or reasonable. *Murphey v. Dalton*, 314 S.W.2d 726, 733–34 (Mo.1958).

21. When a trust's provisions present a legitimate question as to the proper terminating distribution of its assets and the dispute between the parties concerns proper interpretation of the trust instrument, an allowance for attorney's fees is proper. *Garrison v. Garrison*, 354 Mo. 62, 188 S.W.2d 644, 649 (1945). Moreover, "[a] trust beneficiary who prevents a wrongful disposition of trust assets renders a benefit to the trust estate as much as the one who recovers back property wrongfully disposed of." *Jesser v. Mayfair Hotel, Inc.*, 360 S.W.2d 652, 661 (Mo. banc 1962). Such a beneficiary may, at the court's discretion, recover his reasonable counsel fees and expenses, either out of the trust estate itself, or by proportional contribution from those who accept the benefit of his efforts. *Id.* "The fact that [a beneficiary's] endeavors served its own interests as well as the interests of the estate does not defeat its right to an allowance out of the estate of a reasonable attorney's fee." *Lang v. Taussig*, 194 S.W.2d 743, 748 (Mo. App. E.D.1946).

the two Blasdel adoptees are lineal descendents of Bendena, and the four Hudson adoptees are lineal descendants of Mathilde. Accordingly, the circuit court's judgment in favor of Commerce Bank against the Hudson adoptees for $6,706.43 is reversed. The circuit court's contrary findings on these issues are also reversed, and the cause is remanded to the circuit court for entry of a judgment determining the terminating distributions to which the above mentioned parties are entitled from each of the three trusts. This is to be done after it conducts a hearing during which the Blasdel and Hudson adoptees are to provide whatever details are required for the circuit court to enter a judgment determining the amount of reasonable attorney's fees and expenses to which they are entitled for prosecuting the chargeable portions of their appeal, be paid from the associated trust estates before final terminating distributions are made. However, the circuit court's judgment denying the Blasdel and Hudson adoptees an award of trial-related attorney's fees and expenses from the trust estate before terminating distributions therefrom is affirmed.

Finally, the circuit court's judgment in favor of the natural children on their claim against the Blasdel adoptees for tortious interference with expectancy of inheritance or gift is reversed and remanded for a new trial solely on the issue of damages.

All concur.