

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| THOMAS R. WINSTON, | ) | |
| | ) | |
| Appellant, | ) | WD76620 |
| | ) | |
| vs. | ) | Opinion filed: September 2, 2014 |
| | ) | |
| DAVID WINSTON and | ) | |
| MICHELLE WINSTON, | ) | |
| | ) | |
| Respondents. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## THE HONORABLE KATHLEEN A. FORSYTH, JUDGE

Before Division Two:  Victor C. Howard, Presiding Judge,
Alok Ahuja, Judge and Mark D. Pfeiffer, Judge

Dr. Thomas R. Winston appeals the trial court's judgment that ordered, among other things, that distributions be made to his children from certain trusts created by his father Dr. Bernard Winston, that certain trusts be amended to remove his power to consent to all distributions to his children, and that he pay $109,117.95 of his children's attorney fees.  The judgment is affirmed in part and reversed in part, and the case is remanded for proceedings in accordance with this opinion.

## Factual and Procedural Background

### *The Trusts*

Dr. Bernard Winston created numerous trusts during his lifetime and made various amendments thereto before his death in 1996. An introduction to these trusts is vital to understanding the issues in this case.

In 1989, Dr. Bernard Winston created an irrevocable trust ("1989 Trust") naming United Missouri Bank of Kansas City ("UMB") as the sole trustee.

In 1990, Dr. Bernard Winston executed a trust agreement which created a generation skipping residuary trust ("GSRT") and a separate residuary trust (collectively "1990 Trusts") and named himself as the trustee and appointed UMB as the successor trustee. Subsequent to the creation of the 1990 Trusts, Dr. Bernard Winston executed seven amendments thereto. Notably, the fifth amendment stated that all prior amendments were superseded by its provisions and the sixth amendment further confirmed that all amendments except the fifth amendment were revoked. In the fifth amendment, Dr. Bernard Winston created the position of "Investment Trustee":

> Notwithstanding any other provision of this Trust Agreement, all actions and decisions of the Trustee relating to investment or reinvestment of the trust estate shall be exercised only by the Investment Trustee appointed under this Paragraph A-1. Any Trustee (including the corporate Trustee) who is not acting as the Investment Trustee under this Paragraph A-1 shall not have any responsibility for, nor the authority to join in any decision regarding, the making or retaining of investments of the trust estate. However, the Trustee (other than the Investment Trustee) shall take all reasonable actions to ensure that the Investment Trustee does not violate any provisions of this Trust Agreement regarding the permissible investments of the trust estate.

Dr. Bernard further named himself as the Investment Trustee of the 1990 Trusts and named Dr. Thomas Winston as the successor Investment Trustee, providing that "if [Dr. Thomas Winston]

2

is unable or unwilling to continue to act as such, the Trustee(s) then acting shall become the Investment Trustee, and the provisions of this Paragraph A-1 shall no longer apply."

The 1990 Trusts give the trustee discretion to make distributions to Dr. Thomas Winston or his descendants who are under age 18 as necessary for health, maintenance, and support, as well as providing for $17,500 to each descendant at the ages of 16 and 19 for the purchase of a new motor vehicle, $9,500 per year for living expenses for Dr. Thomas Winston's children who are "qualifying students," and amounts necessary to assist said children with the reasonable costs associated with becoming a "qualifying student." The 1990 Trusts permitted Dr. Thomas Winston to disapprove or veto distributions to his children during his lifetime, with provisions following each potential distribution to the children mandating that no distributions be made to them without his consent. The consent portion at the end of the income distribution provision reads:

> Provided, however, during Thomas' life, no distribution shall be made to or for the benefit of a descendant of Thomas without the consent of Thomas (or by his legal representative during any period Thomas is under a legal disability). Notwithstanding the above provisions, Thomas' consent to any distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

The consent portion of the provision titled "Distributions from GSRT to or for the Benefit of Thomas' Children" reads:

> Notwithstanding anything set forth in the preceding paragraph, during Thomas' life, no distribution shall be made to a child of Thomas under this Subparagraph A(3) without the specific approval of Thomas (or without the approval of Thomas' legal representative during any period Thomas is under a legal disability). Notwithstanding the above provisions, Thomas' consent to any distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

Additionally, there is a no-contest clause applicable to the 1990 Trusts, which reads:

> If any person who has been given an interest in a trust estate under this Trust Agreement institutes or joins in (except as a party defendant) any proceeding to contest the validity of this Trust Agreement or any of its provisions, all benefits provided for that person shall be revoked[.]

In 1993, Dr. Bernard Winston executed another trust agreement that created another irrevocable trust ("1993 Trust"). The 1993 Trust named UMB and Dr. Thomas Winston as co-trustees, and was for the benefit of Dr. Thomas Winston and his children, having provisions for distributions similar to those in the 1990 Trusts, but providing that such distributions from the 1990 Trusts would reduce the distributions from the 1993 Trust. The 1993 Trust also contained similar consent provisions as the 1990 Trusts requiring Dr. Thomas Winston's consent for all distributions to his children. The 1993 Trust did not contain a no-contest provision.

Dr. Bernard Winston also created a number of trusts in which he placed numerous paintings, naming Dr. Thomas Winston as the trustee and Dr. Thomas Winston's children as the beneficiaries, the paintings to be held for them until they reach the age of thirty.

### *Litigation*

Dr. Bernard Winston died in 1996, at which time Dr. Thomas Winston had two children ("the twins") who were six years old. UMB became the general trustee of the 1990 Trusts and Dr. Thomas Winston became the investment trustee. In July of 2010, Dr. Thomas Winston filed suit against UMB alleging breach of fiduciary duty and requesting an accounting and turnover of property. The trial of these claims has not yet occurred and the issues involved are not a part of this appeal.

In August of 2010 UMB filed a third party petition against the twins requesting approval of its resignation as corporate trustee, appointment of a successor corporate trustee, approval of a final accounting of the trust, and a release of trustee. The twins filed an answer, as well as a

4

counter-petition and then an amended counter-petition against Dr. Thomas Winston, in which they alleged breach of fiduciary duty and trust and violations of Uniform Transfers to Minor Act and/or conversion, and requested removal of trustee and reformation of trust. With the first two counts, the twins requested punitive damages and attorney's fees. The parties filed cross-motions for summary judgment. Before any rulings on the motions, the twins dismissed with prejudice their claim of violation of the Uniform Transfers to Minor Act and/or conversion. The trial court ruled on the summary judgment motions orally, on the first day of trial, granting Dr. Thomas Winston's motion for summary judgment as to any issues regarding the 1989 Trust and denying all other summary judgment motions.

### *The Judgment*

With regard to the painting trusts, the trial court held that Dr. Thomas Winston had not breached his duty to safeguard the trust assets and that he did breach a duty to account to the twins about the location of the paintings, but that they had not been damaged. The court denied the twins' requests that Dr. Thomas Winston be removed as trustee, and that the painting trusts be reformed. The court ordered that Dr. Thomas Winston have the paintings appraised to ensure that they have sufficient insurance coverage, with the appraisal expense to be borne by the twins.

With regard to the 1990 Trusts, the court concluded that the twins had not violated the no-contest clause and that Dr. Thomas Winston had breached a fiduciary duty to the twins by failing to consider their best interests in determining whether or not to consent to distributions. The court declined to remove Dr. Thomas Winston as investment trustee, and it declined the twins' request to split the trust into thirds. The court also noted that any relief requested and not addressed was denied, which would include the twins' request to remove Dr. Winston's power of appointment with regard to certain assets in the residuary trust. However, the court reformed the

5

1990 Trust Agreement to remove Dr. Thomas Winston's power to consent to distributions to the twins. The court also ordered the corporate trustee to make specific distributions to the twins from the 1990 Trusts for automobile and educational expenses.

As to the 1993 Trust, the trial court removed Dr. Thomas Winston's consent power from the trust agreement. The court held that Dr. Thomas Winston did not breach a fiduciary duty to make distributions from the 1993 Trust, in that the 1990 Trusts contain sufficient funds. The trial court denied the twins' request for punitive damages, stating that it could not "discount the sincerity of Thomas's belief" that he had an absolute right to authorize or refuse distributions from the trusts. However, the court held that Dr. Winston should have to pay $109,117.95 of the twins' attorney's fees personally, based on the court's conclusion that he breached a fiduciary duty.

### The Appeal

Dr. Thomas Winston does not appeal the trial court's rulings regarding the 1989 Trust or the Painting Trusts. All issues on appeal relate to the 1990 Trusts, the 1993 Trust, and the trial court's award of attorney fees. Dr. Thomas Winston specifically challenges the trial court's ruling that the corporate trustee make distributions from the 1990 Trusts to the twins for automobile and educational expenses, the trial court's amendment of the 1990 Trust Agreement and the 1993 Trust Agreement removing Dr. Thomas Winston's power to consent to all distributions to his descendants, and the trial court's award of $109,117.95 in attorney fees to the twins to be paid by Dr. Thomas Winston personally.

These challenges are based on the four arguments raised in Dr. Thomas Winston's appeal. First he argues the twins violated the no contest clause of the 1990 Trusts by filing their counter petition in this case and requesting affirmative relief in the form of removing him as

6

trustee; removing his power of consent; either reformation, modification, or termination of the trust; and severing of the trust into three separate ones for each beneficiary. Dr. Thomas Winston also argues that the trial court erred in its legal conclusions that Dr. Thomas Winston's consent powers obligated him to act in the twins' best interests. Dr. Thomas Winston contends that the trial court erred in its legal conclusion that there was clear and convincing evidence in the record that circumstances changed such that the trusts must be reformed to effectuate Dr. Bernard Winston's intent. Finally, Dr. Thomas Winston asserts that the trial court's award of attorney's fees to the twins was erroneous because it was based on their prevailing on most issues, and the trial court erred in ruling in the twins' favor on those issues (no contest clause, breach of fiduciary duty, modification); and argues in the alternative that if this Court finds the trial court did not err in ruling in the twins' favor on the particular issues he challenges on appeal, then the award of attorney's fees still must be remanded "for a recalculation of the attorney's fees, with only fees for work done on successful claims chargeable to Dr. [Thomas] Winston."

### Standard of Review

In a bench-tried case, the judgment of the trial court will be affirmed on appeal unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Claims that there is no substantial evidence to support the judgment or that the judgment is against the weight of the evidence necessarily involve review of the trial court's factual determinations. *Pearson*, 367 S.W.3d at 43. A reviewing court will overturn a trial court's judgment under these fact-based standards of review only when the court has a firm belief that the judgment is wrong. *Id.* On the other hand,

7

a claim that the judgment erroneously declares or applies the law involves review of the propriety of the trial court's construction and application of the law. *Id.*

An appellate court reviews questions of law *de novo* without deference to the trial court's conclusions. *Id.* at 43-44. In reviewing questions of fact, the appellate court defers to the trial court's assessment of the evidence if any facts relevant to an issue are contested. *Id.* at 44. This is so because the trial court is in a better position not only to judge the credibility of witnesses directly but also their sincerity and character and other trial intangibles that may not be completely revealed by the record. *Id.* When evidence is contested, a trial court is free to disbelieve any, all, or none of the evidence. *Id.* "'[T]he appellate court's role is not to re-evaluate testimony through its own perspective.'" *Id.* (quoting *White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2010)).

The construction of a legal document, such as a trust, based upon its language is reviewed *de novo*. *Kimberlin v. Dull*, 218 S.W.3d 613, 615 (Mo. App. W.D. 2007). "Whether a fiduciary duty exists is a question of law, while the breach of that duty is for the trier of fact to decide." *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 15 (Mo. banc 2012) (citing *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 481 (Mo. banc 2005)).

**Discussion**

*I. No-Contest Clause*

Dr. Thomas Winston's initial complaint is that the twins violated the no contest clause of the 1990 Trusts by filing their counter petition in this case and requesting affirmative relief in the form of removing him as trustee; removing his power of consent; either reformation, modification, or termination of the trust; and severing of the trust into three separate ones for each beneficiary. The twins argue in response that they fit the exception in the no contest clause

for those who join in a proceeding regarding the trusts as a party defendant, and their requests for relief in their counter petition did not "contest the validity of [the 1990 Trusts] or any of [their] provisions."

The no-contest clause applicable to the 1990 Trusts reads:

If any person who has been given an interest in a trust estate under this Trust Agreement institutes or joins in (except as a party defendant) any proceeding to contest the validity of this Trust Agreement or any of its provisions, all benefits provided for that person shall be revoked[.]

The twins alleged breach of fiduciary duty, breach of trust, and unforeseen circumstances in their counterpetition against Dr. Thomas Winston. They sought damages for Dr. Thomas Winston's breach; to have Dr. Thomas Winston removed as trustee from the trusts, to be replaced with an impartial trustee; to have Dr. Thomas Winston's discretionary power over distributions to the twins removed; punitive damages; costs; attorney fees; reformation, modification, or termination of the trusts and distribution of the trust property into thirds to be placed in three new trusts one for each beneficiary, or in the alternative, that the court partition and or modify the trusts as it saw fit given the unforeseen circumstances.

Analysis of the meaning of a trust provision, such as the no contest provision of the 1990 Trusts, is governed by the primary rule of trust construction: the settlor's intent at the time of the creation of the trust controls and is to be ascertained primarily from the trust instrument as a whole. *Commerce Bank, N.A. v. Blasdel*, 141 S.W.3d 434, 443 (Mo. App. W.D. 2004). This Court specified in *Chaney v. Cooper*, 954 S.W.2d 510, 519 (Mo. App. W.D. 1997):

In reviewing the applicability of forfeiture provisions or "no-contest" clauses, courts are to consider the facts of the particular case, and those facts are to be considered and applied with "a careful regard for the phrasing or language of the no-contest or forfeiture clause; and, having in mind that forfeitures are not favored by the law. A no-contest or forfeiture provision is to be enforced where it is clear that the trustor (or testator) intended that the conduct in question should forfeit a beneficiary's interest under the indenture (or will)." *Cox v. Fisher*, 322

9

S.W.2d 910, 915 (Mo.1959). *See also Liggett v. Liggett*, 341 Mo. 213, 108 S.W.2d 129, 134 (1937).

Here, neither the trust instrument nor the Missouri Uniform Trust Code, RSMo Chapter 456, defines "contest" nor "validity," thus we employ the ordinary meaning of these terms in analyzing Dr. Bernard Winston's intent in the no contest provision. Black's Law Dictionary provides three definitions of "contest," the second of which is applicable to its use in the 1990 Trusts: "To litigate or call into question; challenge <they want to contest the will>." *Black's Law Dictionary* 361 (9th ed. 2009). "Valid," the adjective form of "validity," is defined as "Legally sufficient; binding <a valid contract>." *Black's Law Dictionary* 1690 (9th ed. 2009). So, to call into question the legal sufficiency of the 1990 Trusts would result in the revocation of benefits to the contesting beneficiary.

In the instant action, none of the allegations or relief sought in the twins' counterpetition questioned the legal sufficiency of the trusts. Rather, it implicitly acknowledged that the trusts were valid, but alleged circumstances that purportedly warranted some form of modification because those circumstances were not foreseen by the settlor when the trust was validly created, and were presently frustrating the settlor's intent as expressed in the trusts. Particularly, the counterpetiton acknowledges the terms it asks the court to modify. It does not call them into question, specifically stating: "Pursuant to the terms of the trusts, [Dr. Thomas Winston] must approve distributions from any of the trusts to his children made during his lifetime."

In *Chaney v. Cooper*, the appeal stemmed from a dispute over the ownership of certain assets, which originated from the condemnation proceeds of a family-owned farm in Missouri. 954 S.W.2d at 513. In that case, there were two wills, executed by a husband and wife, of whom the husband passed first and the wife many years later. *Id.* The petitioners in the action had, among other things, objected to the probate of the wife's will, based upon the contention that the

10

husband's will, rather than the wife's, controlled the property. *Id.* at 519. This Court found that the no-contest clause only pertained to the validity of the wife's will, not to petitioners' questioning of the construction of the husband's will as it pertained to the disposition of the property. *Id.* This Court therefore concluded that the respondent's contention that the petitioners' objection to the probate of the wife's will was an action that fell under the *in terrorem* clause thus prohibiting the petitioners from taking under her will was without merit. *Id.* at 518, 19.

Similarly, the twins' counterpetition in the instant case alleges, essentially, that Dr. Bernard Winston would never have foreseen the abuse of the twins allegedly inflicted by Dr. Thomas Winston, and had he foreseen it, would not have granted Dr. Thomas Winston the veto power as to distributions from the trusts. It concludes that because of the complete estrangement between Dr. Thomas Winston and the twins, it is impossible to effectuate the settlor's intent in the trusts. Simply stated, these allegations and the relief sought do not challenge the validity of the trusts at all. Rather, the validity of the trusts is implicitly acknowledged, and the relief sought is based on circumstances outside the trust instruments. As such the twins' action does not trigger the no contest clause.

## II. Power of Consent/Veto Power

Dr. Thomas Winston specifies that he does not challenge the trial court's factual findings that Dr. Thomas Winston was biased against the twins based on hostility between them and that he failed to determine whether authorizing distributions would be in the twins' best interest. He argues, rather, that the trial court erred in its legal conclusions based on these findings that (1) Dr. Thomas Winston's consent powers obligated him to act in the twins' best interests, and (2)

11

there was clear and convincing evidence in the record that circumstances changed such that the trusts must be reformed to effectuate Dr. Bernard Winston's intent.

The trial court made a factual finding that Dr. Bernard Winston gave Dr. Thomas Winston the power to grant or withhold consent to distributions to the twins "with the expectation that [Dr. Thomas Winston] would act in their best interests[,]" and that "[t]here [was] no evidence that [Dr. Bernard Winston] intended that [Dr. Thomas Winston's] consent power be used as an instrument of control or punishment." The trial court made the legal conclusion that "[t]he terms of the 1990 Trust Agreement with respect to the trustees' fiduciary duties mirrors Missouri law and confirms that [Dr. Bernard Winston's] intent and the law are consistent. Thus [Dr. Thomas Winston's] consent powers with respect to distributions to the Twins are not absolute and are constrained by fiduciary principles."

The intention and meaning of the settlor of a trust is to be determined by what he said in his trust, and not by attempting "to guess what he meant or what he might have done under certain conditions if not expressed in his will." *See Blasdel*, 141 S.W.3d at 443 (internal quotations omitted) (noting that "Although this and many other cases cited herein concern wills, Missouri courts generally use the same rules for construing both trusts and wills.). The intent of the testator, or in this case, the settlor, must be analyzed based upon what the trust instrument "actually says and not by what we might imagine the testator [(or settlor)] intended to say or would have said if he had decided to further explain his intention." *Id.*

> While it is not inappropriate to resort to outside evidence of surrounding circumstances to identify the beneficiaries, to explain their relationship to the testators, or to show the nature and extent of the testators' holdings, even when such explanatory material has been obtained, we must still look primarily to the language of the will.

*Id.* (internal citation omitted).

12

Furthermore, it is well established that

> absent any ambiguity in the terms of a legal instrument, the intent of its maker, including the intent of a testator or the settlor of a testamentary or inter vivos trust, is to be ascertained from the four corners of the instrument without resort to parol evidence as to that intent . . . . Where the language used is clear and of well-defined force and meaning, it must stand as written and extrinsic evidence of what was intended in fact cannot be adduced to qualify, explain, enlarge, or contradict the language . . . . [E]xtrinsic evidence, including the grantor's own statements, regarding the grantor's intentions is normally inadmissible. [T]he intentions of the testator must be gleaned from the written unambiguous will, not from what the testator or the will's scrivener, after execution of the instrument, contrarily declared, either orally or in writing, to be testator's intentions or the meaning of provisions in the will.

*Id.* at 444 (internal citations and quotations omitted).

The trial court's conclusion that the veto power Dr. Bernard Winston gave Dr. Thomas Winston over distributions to the twins carried with it fiduciary limitations appears to be based upon language from the third amendment to the 1990 Trusts, which was superseded by the fifth amendment, and revoked in the sixth amendment. The trial court's reliance on language from a revoked amendment is erroneous. The trust documents currently in effect are not ambiguous and clearly give Dr. Thomas Winston power to give or withhold consent to any distributions to the twins with no criteria for or limitations on that consent.

The 1990 Trusts contain many indications that Dr. Thomas Winston's consent power over distributions to the twins is separate from his limited duties and responsibilities as investment trustee, as well as that the consent power is absolute.

First, the trust refers to Dr. Thomas Winston as "Thomas" when giving him consent power and as a beneficiary in most every reference to him in the trust. On the other hand, the provision creating the position of Investment Trustee initially gives the position to Dr. Bernard Winston and then names as backup "THOMAS R. WINSTON." Second, the term further provides that if "THOMAS R. WINSTON" is unable or unwilling to act in that capacity, the

13

responsibility and authority of the Investment Trustee position simply revert back to the general trustee. In contrast, each of the provisions giving "Thomas" authority to give or withhold consent to distributions to the twins specify that such authority will pass to "his legal representative during any period Thomas is under a legal disability" rather than the authority just reverting to the general trustee or any other named individual.

The Investment Trustee provision essentially just removes the "responsibility for, [and] the authority to join in any decision regarding, *the making or retaining of investments of the trust estate*" (emphasis added) from the general trustee, giving such responsibility and authority to the Investment Trustee, instructing that the general trustee "take all reasonable actions to ensure that the Investment Trustee does not violate any provisions of this Trust Agreement *regarding the permissible investments of the trust estate*." (emphasis added). No responsibility or authority rests with the position of Investment Trustee besides that of making or retaining the investments of the trust estate. The Investment Trustee provision, located in Article VI of the trust, does not expressly nor implicitly implicate, much less limit, the consent terms of the distribution provisions of Article II.

The consent power given to "Thomas" (not to the Investment Trustee) is repeated following each provision in which there is a possible distribution to the twins. It contains no limitations on what basis the decision to give or withhold consent may be made. It neither expresses nor implies any fiduciary duty on the consent power. The consent terms do not mention the "Investment Trustee" or any trustee, just "Thomas." Notably, the consent power is repeated at the *end* of distribution provisions that each *begin* by giving the general trustee direction or permission in the *trustee's* sole discretion to make some distribution, and specify certain purposes and certain limitations for the distribution, before the possible distribution even

14

reaching "Thomas" (not the Investment Trustee) for his free and voluntary consent. In introducing the consent power, the words "Provided, however" and "Notwithstanding anything set forth in the preceding paragraph" are used, indicating that the consent power overrides that which is provided in the preceding language.

For the provision regarding distributing income from the Generation-Skipping Residuary Trust ("GSRT"), the consent power is given in the final two sentences:

> Provided, however, during Thomas' life, no distribution shall be made to or for the benefit of a descendant of Thomas without the consent of Thomas (or by his legal representative during any period Thomas is under a legal disability). Notwithstanding the above provisions, Thomas' consent to any distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

The consent portion of the provision titled "Distributions from GSRT to or for the Benefit of Thomas' Children" reads:

> Notwithstanding anything set forth in the preceding paragraph, during Thomas' life, no distribution shall be made to a child of Thomas under this Subparagraph A(3) without the specific approval of Thomas (or without the approval of Thomas' legal representative during any period Thomas is under a legal disability). Notwithstanding the above provisions, Thomas' consent to any distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

The residuary trust ("RT") provision on distribution of income allows the trustee in his discretion to distribute to the twins from that trust "to the extent the income and principal of the GSRT are insufficient" to make the distributions provided for in the GSRT for automobiles, college tuition, textbook costs, and qualified student living expenses, but again states, "Provided, however, during Thomas' life, no distribution shall be made to or for the benefit of a descendant of Thomas without the consent of Thomas (or by his legal representative during any period Thomas is under a legal disability)." The RT provision for distribution of principal for other

15

reasons also specifies that "[n]otwithstanding anything set forth in this [s]ubparagraph [], during Thomas' life, no distribution shall be made to a child of Thomas under this [s]ubparagraph [] without the specific approval of Thomas (or without the approval of Thomas' legal representative during any period Thomas is under a legal disability)."

The 1990 Trust further limits distributions "[i]n the event Thomas and his spouse begin living separately as a result of marital discord." It specifies that

> [d]uring such period, such income may be distributed only for the benefit of one of Thomas' descendants in accordance with permitted distributions to a "qualifying student" . . . and then only with the consent of Thomas. Thomas' consent to any such distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

In sum, the consent power Dr. Bernard Winston gave Dr. Thomas Winston in the 1990 Trusts is unambiguous and clearly contains no limitations on what basis the decision to give or withhold consent may be made. No fiduciary duty is expressly or impliedly connected to the consent power. The consent terms do not mention the "Investment Trustee" but rather "Thomas." The distribution provisions containing the consent power all give the general trustee direction or permission in the *trustee's* sole discretion to make a distribution based on certain purposes and with certain limitations. Only after this discretion has been exercised by the *trustee* in accordance with the *trustee's* fiduciary duties does the possible distribution come before "Thomas" (not the Investment Trustee) for his *free and voluntary* consent. And finally, use of the words "Provided, however" and "Notwithstanding anything set forth in the preceding paragraph" indicates that the consent power overrides whatever is provided in the preceding language.

Based on the foregoing, the trial court's conclusion that Dr. Thomas Winston's consent/veto power carried with it fiduciary responsibilities was a misapplication of law.

16

### III.  *Hostility and Estrangement Not Unforeseen Circumstance*

Dr. Winston also argues that the trial court erred in its legal conclusion that there was clear and convincing evidence in the record that circumstances changed such that the trusts must be reformed to effectuate Dr. Bernard Winston's intent.

At trial it was revealed that, prior to Dr. Bernard Winston's death, he had a positive relationship with the twins.  Testimony at trial also revealed that there had been significant hostility between Dr. Thomas Winston and the twins.  Two years after the death of Dr. Bernard Winston, Dr. Thomas Winston and the twins' mother and his wife at the time, Julia Steinberg (formerly Julia Winston), were divorced.  The relationship between the twins and Dr. Thomas Winston worsened with time, and at the time of trial they were completely estranged.  The last time the twins saw Dr. Thomas Winston before the trial was eight years earlier.

In its judgment the trial court concluded that there was clear and convincing evidence that there had been a change of circumstances such that Dr. Bernard Winston's intent would be thwarted absent a reformation of the provisions of the 1990 Trusts "to eliminate [Dr. Thomas Winston's] participation in decisions relating to discretionary distributions to the Twins[.]"

The record, however, indicates that hostility and estrangement between family members was *not* unforeseeable by Dr. Bernard Winston when he executed and amended the trust instruments.  First, from the inception of the 1990 Trusts, Dr. Bernard Winston specifically provided for what should happen regarding distributions if Dr. Thomas Winston separated from his wife.  Second, the 1990 Trusts emphatically declare that "in all events, the Grantor's son, DONALD S. WINSTON, M.D. and his descendants, if any, shall not receive nor be entitled to any distributions under this Trust Agreement[,]" evincing a clear knowledge that a father may have a negative or nonexistent relationship with his natural child and wish not to provide for him

or her. Furthermore, as previously discussed, the consent power language makes no indication, express or implied, that such power is only to be exercised in the best interests of Thomas's descendants, showing that his intent was that Dr. Thomas Winston be the final arbiter of whether his descendants receive distributions from the trust.

Based on the foregoing, the trial court's conclusion that there was a change of circumstances requiring reformation of the 1990 Trusts to remove the consent/veto power Dr. Bernard Winston expressly gave to Dr. Thomas Winston in the 1990 Trusts was a misapplication of law.

## IV. The 1993 Trust

Dr. Thomas Winston is a general trustee for the 1993 Trust. However, the 1993 Trust, is much like the 1990 Trusts. It contains many indications that Dr. Thomas Winston's consent power over distributions to the twins is absolute and is separate from his position as trustee and the duties and responsibilities of that position.

First, the trust refers to Dr. Thomas Winston as "Thomas" when giving him consent power and as a beneficiary in most every reference to him in the trust. On the other hand, the opening paragraph creating the trust states the agreement is "between BERNARD H. WINSTON, M.D., of Jackson County, Missouri, as 'Grantor', and THOMAS R. WINSTON, M.D., as 'Trustee'." Second, a term called "Successor Trustees" provides that "[i]n the event THOMAS R. WINSTON, M.D. should fail or cease to act as Trustee for any reason, UNITED MISSOURI BANK OF KANSAS CITY, N.A. shall become successor trustee." In contrast, each of the provisions giving "Thomas" authority to give or withhold consent to distributions to the twins specify that such authority will pass to "his legal representative during any period Thomas

18

is under a legal disability" rather than the authority just reverting to the successor trustee or any other named individual.

Furthermore, any provisions detailing the position, duties, or responsibilities of the Trustee, do not expressly nor implicitly implicate, much less limit, the consent/veto power the 1993 Trusts gives to "Thomas".

The consent power given to "Thomas" (not to the Investment Trustee) is repeated following each provision in which there is a possible distribution to the twins. It contains no limitations on what basis the decision to give or withhold consent may be made. It neither expresses nor implies any fiduciary duty on the consent power. The consent terms do not mention the Trustee, just "Thomas." Notably, the consent power is repeated at the *end* of distribution provisions that each *begin* by giving the Trustee direction or permission in the *trustee's* sole discretion to make some distribution, and specify certain purposes and certain limitations for the distribution, before the possible distribution even reaching "Thomas" (not the Investment Trustee) for his free and voluntary consent. In introducing the consent power, the words "Provided, however," "However," and "Notwithstanding the above provisions of this Paragraph" are used, indicating that the consent power overrides that which is provided in the preceding language.

For the provision regarding distributing income from the Residuary Trust ("RT") portion of the 1993 Trust, the consent power is given in the final sentence:

> Provided, however, during Thomas' life, no distribution shall be made to or for the benefit of a descendant of Thomas without the consent of Thomas (or by his legal representative during any period Thomas is under a legal disability).

The RT portion also provides for distributions of medical expenses, but specifies:

> However, any distribution to or for the benefit of one of Thomas' descendants shall only be made with the consent of Thomas (or Thomas's legal representative

19

if Thomas is under a legal disability). Such consent to any distribution to be made to one of Thomas' descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily.

The RT portion further provides for distributions for qualifying students, with the caveat:

Notwithstanding the above provisions of this Paragraph [], during Thomas' lifetime, no distribution shall be made to a child of Thomas under this Subparagraph [] without the specific approval of Thomas (or without approval of Thomas' legal representative during any period Thomas is under a legal disability). Thomas' consent to any distribution to be made to one of his descendants may not be given more than sixty (60) days in advance, and shall be deemed valid only to the extent it is given freely and voluntarily

In sum, the consent power Dr. Bernard Winston gave Dr. Thomas Winston in the 1993 Trust is unambiguous and clearly contains no limitations on what basis the decision to give or withhold consent may be made. No fiduciary duty is expressly or impliedly connected to the consent power. The consent terms do not mention the "Trustee" but rather "Thomas." The distribution provisions containing the consent power all give the Trustee direction or permission to make a distribution based on certain purposes and with certain limitations. Only after this discretion has been exercised by the *Trustee* does the possible distribution come before "Thomas" for his *free and voluntary* consent. And finally, use of the words "Provided, however," "However," and "Notwithstanding the above provisions of this Paragraph" indicates that the consent power overrides whatever is provided in the preceding language.

## *V. Attorney Fees*

Dr. Thomas Winston argues that the trial court's award of attorney's fees to the twins was erroneous because it was based on their prevailing on most issues, and the trial court erred in ruling in the twins' favor on those issues (no contest clause, breach of fiduciary duty, modification). Dr. Thomas Winston makes the alternative argument that if this Court finds the trial court did not err in ruling in the twins' favor on the particular issues he challenges on

20

appeal, then the award of attorney's fees still must be remanded "for a recalculation of the attorney's fees, with only fees for work done on successful claims chargeable to Dr. [Thomas] Winston." The twins argue in response that (1) section 456.10-1004 does not require that attorney's fees be awarded only to a prevailing party, (2) the trial court cited numerous reasonable factors that led it to award the twins' the amount of attorney's fees that it did, and (3) because the litigation was brought and defended in good faith and there were issues addressed which could only have been settled via judicial determination, the award of attorney's fees was proper.

Section 456.10-1004 provides:

In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

Review of a trial court's decision to award attorney's fees is for abuse of discretion. *O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400, 418 (Mo. App. W.D. 2013) (citing *In re Gene Wild Revocable Trust*, 299 S.W.3d 767, 782 (Mo. App. S.D. 2009)). If the award of attorney's fees is either arbitrarily arrived at or so unreasonable as to indicate indifference and lack of proper judicial consideration, then the trial court has abused its discretion. *Id.* The trial court's award of attorney's fees is presumed correct, and the complaining party has the burden to prove otherwise. *Id.* Appellate review of a challenge to an award of attorney's fees gives deference to the discretion of the trial judge who, because of his or her office and experience, is considered an expert in determining the proper amount of compensation for legal services. *Id.* at 418-19.

The trial court's stated reasoning for awarding the twins' attorney's fees to be paid by Thomas personally was as follows:

> Justice and equity require that the Twins, who did not initiate the instant suit but were brought into this litigation as third party defendants, and whose interests as beneficiaries of the Trusts were damaged as the result of Thomas's breach of fiduciary duties, be awarded costs and expenses in this case, including reasonable attorney's fees. To charge such costs and expense against Trust principal would damage the future interest of the Twins, who were innocent of wrongdoing in this case. Therefore, such attorney's fees are properly chargeable against Thomas, whose actions necessitated the Twins' counterclaim, as a surcharge for his breach of fiduciary duties.

While it is true that the twins did not initiate the instant action but were brought in as third-party defendants; as discussed above, Dr. Thomas Winston did not have a fiduciary duty attached to his consent/veto power, and thus there was no breach of fiduciary duty. The award of attorney's fees is reversed and remanded for further consideration in accordance with this opinion.

Additionally, the twins moved for attorney's fees for the instant appeal and the motion was taken with the appeal.

> Missouri has adopted the "American Rule" which provides that litigants are generally required to bear the expense of their own attorney's fees absent statutory authorization or contractual agreement. However, both trial and appellate courts may award attorney's fees to a party if such an award is authorized by statute[.]

*Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo. App. W.D. 2002) (citations omitted).

Section 456.10-1004 allows the court to award attorney fees in a judicial proceeding involving the administration of a trust "as justice and equity may require[.]" Additionally,

> [w]hen fixing the amount of attorney's fees to be awarded, courts are considered experts, and their expertise extends to the value of appellate services. And, although appellate courts have the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested.

*Rosehill Gardens, Inc.*, 67 S.WW.3d at 648.

The issue of attorney's fees, costs, and expenses on appeal is therefore remanded to the trial court for determination "as justice and equity may require" in accordance with section 456.10-1004.

**Conclusion**

The twins did not violate the no-contest clause of the trusts. Dr. Thomas Winston's veto/consent power over potential distributions to the twins is separate from any fiduciary role he has in connection with the trusts and is not limited by fiduciary considerations. The estrangement and hostility between Dr. Thomas Winston and the twins did not constitute changed circumstances such that the trusts must be reformed to effectuate Dr. Bernard Winston's intent. Based on the foregoing, we reverse the trial court's conclusion that Dr. Thomas Winston breached a fiduciary duty as to the 1990 Trust, the trial court's order to remove Dr. Thomas Winston's veto/consent power over potential distributions to the twins, and the trial court's order that distributions for automobile and educational expenses be made to the twins from the 1990 Trust.

At least part of the trial court's reasoning for its award of attorney's fees to the twins is reversed in this opinion, and therefore the issue of attorney's fees, costs, and expenses of the case is reversed and remanded for determination in accordance with section 456.10-1004 and the conclusions of this opinion.

_____
VICTOR C. HOWARD, JUDGE

All concur.

23