

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

ACE A. CARPENTER AND )
SANDRA CARPENTER, )
                      )
         Appellants, )     WD86351
                      )
v. )     OPINION FILED:
                      )
KATHLEEN R. CARPENTER, )     April 30, 2024
                      )
         Respondent. )
                      )

**Appeal from the Circuit Court of Platte County, Missouri**
**Honorable Thomas Fincham, Judge**

**Before Division Four: Gary D. Witt, Chief Judge Presiding,**
**Janet Sutton, Judge, and Daniel White, Special Judge**

Ace A. Carpenter and Sandra Carpenter (the Carpenters) appeal a judgment entered by the Platte County Circuit Court (trial court) granting their petition for partition and ordering the sale of certain property in Parkville, Missouri, owned by the Carpenters and Kathleen Carpenter (Kathleen).[1] The trial court's judgment ordered that Kathleen receive the first $496,000 from the property sale's proceeds and the remainder of the proceeds to be split evenly between Kathleen and the Carpenters. On appeal, the Carpenters contend that there is no substantial evidence to

---

[1] Because the involved parties share the same surname, for ease of reference, we periodically refer to the parties individually by their first names. We mean no familiarity or disrespect.

support the trial court's judgment awarding the first $496,000 of the property sale's proceeds to Kathleen. We affirm in part and reverse and remand in part for entry of a judgment consistent with this opinion.

**Factual and Legal Background**

This appeal arises out of an April 2022 action filed by the Carpenters to partition a property with a warehouse on it located in Parkville, Missouri. The appeal focuses on the trial court's award of the first $496,000 of the partition net sale proceeds as reimbursement to Kathleen before then dividing the balance between the parties. The following evidence was adduced at the March 2023 bench trial on the matter.

*Evidence at Trial*

Ace, age 81, and Sandra, age 79, are husband and wife. For many years, Ace and Sandra had an interior design and floor-covering sales and installation business known as Sandy Carpenter Interiors. Around 1994, Ace and Sandra gifted their son James Carpenter (James) this business which James then incorporated as Carpenter's Floorcovering, Inc. (CFI). At the time, Kathleen was married to James. In August 1994, the Carpenters and Kathleen and James purchased a real estate lot in Parkville, Missouri. (The property). At this same time, the joint venture[2] also opened a checking account and each couple deposited $3,000 into the account. This account was to accept rents from tenants of the future warehouse and to pay out profit distributions to the four individuals.

The property was purchased in the names of Ace and Sandra as husband and wife and James and Kathleen as husband and wife, with each couple owning a one-half undivided tenancy

_____

[2] We refer to Ace, Sandra, James, and Kathleen and their business arrangement collectively as the "joint venture" and note that the four did not form a corporation.

2

by the entirety interest in the property. The property's purchase price was $31,000. Kathleen testified that she and James paid for the property with a personal cashier's check from their savings account, that Ace and Sandra did not contribute money to the property's purchase, and that Kathleen was never reimbursed. Sandra testified that although Kathleen wrote the check for the property at the closing, "very soon after" she reimbursed James $15,000 for the Carpenter's one-half share of the property's purchase price. Sandra testified that the source of the funds for the Carpenter's contribution to the property purchase was a home equity loan, but she acknowledged that she did not have records showing the $15,000 payment or the home equity loan.

A $135,000 loan was taken out to construct a warehouse on the property.[3] Kathleen testified that she and James paid the loan back in full. Kathleen offered, and the trial court admitted, Exhibit E, which consisted of check registers establishing that she transferred $130,000 from a personal account into the joint venture's bank account to pay for the warehouse construction. Kathleen testified that the Carpenters did not contribute money to the warehouse's construction or to the bank loan, and Kathleen was not reimbursed for her payment of $130,000 for the warehouse construction.

Sandra testified that she was the joint venture's bookkeeper for approximately twenty-eight years, and that on December 1, 1995, James was reimbursed $130,000 for the building construction expenses. In support of this, the Carpenters introduced Exhibit 9, the "warehouse account['s]" itemized profit and loss statement for January 1994 through December 1995, showing a December 1, 1995, entry of a $130,000 reimbursement to James. Sandra also testified

---

[3] An exhibit was introduced into evidence at the trial about this loan, but this exhibit was not included in the record on appeal for our review.

that Exhibit 9 showed that the joint venture reimbursed James for the interest on the loan to construct the warehouse, and that the joint venture also paid for various work done on the property during 1994 and 1995 when the warehouse was built.[4]

Ace testified that he cleared the land and got it ready for the warehouse construction and acted as the contractor. He stated, "Our agreement with my son [James] was that he would put up the finances and I would do the work and get it done because he had to work, he had to lay carpet to make a living, and I did so." Ace also testified that he paid for and completed many repairs and other work on the warehouse and that he was not reimbursed for those expenses. Ace agreed that he did not personally contribute cash for the original warehouse construction, but that he was the contractor for the project which acted as an "equal trade-out" for the work Ace did with the capitol James provided. Ace acknowledged that he did not have any corroborating receipts for the work and money he contributed to the warehouse.

In November 2006, CFI took out a $150,000 business loan to construct an addition to the warehouse. Kathleen testified that she and James paid back the loan out of their personal resources and it was paid in full by 2010. The Carpenters did not pay any money toward the $150,000 loan. The Carpenters did not testify about any contributions to this business loan, although Ace testified generally that he did repairs and other work on the property. Exhibit K contained pages from CFI's 2006 check register and also invoices for materials, labor, and other expenses incurred for the warehouse's addition. The various invoices were billed to CFI, James, Kathleen, Ace, and Sandra. Kathleen testified that the expenses in Exhibit K were paid by CFI.

---

[4] Exhibit 9 included entries showing payments for building expenses to Lock Steel Building, an architect, and for brick, concrete and gravel, plumbing, building materials, excavating and electrical work.

In December 2012, Kathleen and James Carpenter's marriage was dissolved. After the dissolution, each owned a one-quarter interest in the property separately as set out in the dissolution judgment. James also executed a beneficiary deed at that time granting Kathleen his interest in the property upon his death. Also, as part of the dissolution, Kathleen was divested of her interest in CFI leaving James as the sole shareholder. James and Kathleen continued to work together professionally after their divorce and Kathleen incorporated a new business named Designer's Showroom, Inc., (DSI). Kathleen was the sole shareholder of DSI and was listed as the president.

In January 2012, DSI entered into a lease agreement with the joint venture where DSI agreed to pay monthly rent to lease space in the warehouse built on the property. CFI, as another tenant in the warehouse from the time it was built going forward to 2022, also paid rent to the joint venture's bank account and James operated his carpet business out of the warehouse. All four parties, Kathleen, James, Ace, and Sandra, received profit distributions from this joint venture account.

James passed away on January 1, 2022. James' one-fourth tenancy in the property transferred to Kathleen by operation of the beneficiary deed, giving her a one-half interest in the property with the Carpenters having the other one-half interest. In early February 2022, Kathleen changed the locks to the warehouse on the property and the Carpenters did not receive new keys to the warehouse and were locked out. Sandra testified that DSI did not pay its February rent payment, although Kathleen testified that she mailed the February rent check.

### Petition for Partition, Counterclaims, Trial, and Judgment

In April 2022, the Carpenters filed a petition seeking partition of the property. The Carpenters requested that the trial court either order the property sold, or, if appropriate, its

5

partition in kind. The Carpenters also requested that if the property was sold, that the net sale proceeds be divided equally between the Carpenters and Kathleen. Kathleen filed an answer asserting various affirmative defenses and counterclaims. Kathleen sought a declaratory judgment that she has full and sole interest related to the property, a partition in kind granting her 100% of the property, a quiet title claim, and a claim for reimbursement of costs and expenditures from any sale of the property.

In November 2022, an appraisal was completed listing the value of the property with the warehouse and its addition to be $1,160,000. In the report, the appraiser stated that the building and its addition increased the overall market value of the property.

At trial, Kathleen requested the court partition the property in kind, granting her sole title to the property, so that she could continue to operate her business there. If the property was instead ordered sold and the proceeds divided, Kathleen sought reimbursement for the lot's cost, $31,000, the original warehouse construction cost, $130,000, and the warehouse addition cost, $150,000. Kathleen also stated that she had "additional expenditures" that she personally paid to improve the property and that these were listed in Exhibit J and K. She stated that the total of the "non-lot/non-building/non-addition" unreimbursed expenses was $185,063, that most of the expenses were from before 2012, and that she personally paid them.

The Carpenters requested that the property be sold and that the net proceeds be distributed fifty-fifty between themselves and Kathleen "with some offsets."

In May 2023, following a bench trial, the trial court entered its judgment. The trial court found in favor of the Carpenters and against Kathleen on the Carpenters' petition for partition and entered judgment in favor of the Carpenters and against Kathleen on all of Kathleen's counterclaims. The trial court found that since the property's purchase in 1994 to the present, the

6

Carpenters and Kathleen made financial and other contributions to the development, construction, maintenance, improvement, and upkeep of the property. The trial court also found that Kathleen "offered proof of various Designers Showroom, Inc., [DSI] expenses incurred to improve its lease space during the term of its tenancy."

The trial court found that the property could not be partitioned in kind without great prejudice to the owners and ordered a partition by sale of the property. The trial court found the property to have a value of $1,160,000 as determined by the appraisal that was entered into evidence at the trial. The court stated that after the costs and the sale expenses of the property were first deducted, the sale proceeds were to be distributed as follows: Kathleen was to receive the first $496,000 from the sale proceeds, and the remainder was to be divided equally between the Carpenters and Kathleen.

The Carpenters appeal.

## Standard of Review

We review partition actions pursuant to the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) standard, which means that we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Reagan v. Bramlett*, 658 S.W.3d 242, 245 (Mo. App. W.D. 2022). "Claims that there is no substantial evidence to support the judgment or that the judgment is against the weight of evidence necessarily involve review of the trial court's factual determinations." *Douglass v. Douglass*, 570 S.W.3d 130, 134 (Mo. App. W.D. 2019) (quoting *Winston v. Winston*, 449 S.W.3d 1, 6 (Mo. App. W.D. 2014)).

> Under these fact-based standards of review, a reviewing court defers to the trial court's assessment of the evidence because the trial court is in a better position not only to judge the credibility of witnesses directly but also their sincerity and character and other trial intangibles that may not be revealed by the record. A reviewing court will overturn a trial court's judgment under these fact-based

7

standards of review only when the court has a firm belief that the judgment is wrong.

*Id.* (internal quotation marks and citations omitted).

As the trier of fact, the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony. This is the case even where the testimony of a witness is not contradicted by other testimony as it is well settled that the trial court is free to believe or disbelieve all, part or none of the evidence, including disbelieving evidence that is uncontroverted.

*Tadych v. Horner*, 336 S.W.3d 174, 177 (Mo. App. W.D. 2011) (internal quotation marks and citations omitted). "A claim that there is no substantial evidence to support the judgment . . . necessarily involves review of the trial court's factual determinations." *McElvain v. Stokes*, 623 S.W.3d 769, 772-73 (Mo. App. W.D. 2021) (quoting *Sauvain v. Acceptance Indem. Ins. Co.*, 437 S.W.3d 296, 302 (Mo. App. W.D. 2014)). This Court "will overturn a trial court's judgment under [this] fact-based [standard] of review only when the court has a firm belief that the judgment is wrong." *Id.* (citations omitted).

When reviewing whether a trial court's judgment is supported by substantial evidence, we view the evidence in the light most favorable to the trial court's judgment and we defer to the trial court's credibility determinations. *Pasternak v. Pasternak*, 467 S.W.3d 264, 268 (Mo. banc 2015). *See also Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014). "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Ivie*, 439 S.W.3d at 199. "To prevail on [a] substantial-evidence challenge, [the appellant] must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law." *Pasternak*, 467 S.W.3d at 268 (quoting *Ivie*, 439 S.W.3d at 200). We will "accept as true the evidence and inferences . . . favorable to the trial court's decree and disregard all contrary evidence." *Ivie*, 439 S.W.3d at 200 (citation omitted). "In addition, [the Supreme Court of

Missouri] has made clear that no contrary evidence need be considered on a substantial-evidence challenge . . . ." *Id.*[5]

On appeal, a successful not-supported-by-substantial-evidence challenge requires completion of three sequential steps where the appellant must: (1) identify a challenged factual proposition necessary to sustain the trial court's judgment; (2) identify all the favorable evidence in the record supporting that position; and (3) demonstrate why that supporting evidence, when considered with the reasonable inferences drawn therefrom, is so lacking in probative value that the trier of fact could not reasonably believe the proposition. *McElvain*, 623 S.W.3d at 773. "[F]ailure to follow the applicable framework means the appellant's argument is analytically useless and provides no support for [their] challenge." *Id.* (quoting *Langston v. Langston*, 615 S.W.3d 109, 116 (Mo. App. W.D. 2020)).

Here, and as we discuss in more detail *infra*, the Carpenters fail to follow the required analytical framework for a no substantial evidence challenge because they did not identify all of the favorable evidence supporting the trial court's judgment, instead focusing primarily on their conflicting evidence. Despite the Carpenters' failure to pursue a meaningful not-supported-by substantial evidence challenge, we will review the Carpenter's arguments on the merits as is consistent with our "preference to dispose of a case following a meaningful consideration of the

---

[5] On the other hand, in an against-the-weight-of-the-evidence challenge, "[e]vidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered[.]" *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). The weight of evidence is not determined by mathematics, but rather, its effect in inducing belief. *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010). Here however, the Carpenters chose to challenge the trial court's judgment using the "no substantial evidence" basis from *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

arguments rather than dismiss the matter due to other deficiencies." *Lukefahr v. Taylor*, 673 S.W.3d 892, 896 (Mo. App. E.D. 2023).

**Legal Analysis**

In the Carpenter's sole point on appeal, they argue that the trial court erred in awarding the first $496,000 of the partition net sale proceeds as reimbursement to Kathleen before then dividing the balance between the parties because the Carpenters contend there is no substantial evidence to support the trial court's award. The Carpenters contend that the only evidence of expenses Kathleen presented were not her own but those of two separate corporations that did not have an ownership interest in the property. The Carpenters request that we reverse that portion of the judgment and order that the partition sale proceeds be equally divided between the parties.[6]

Chapter 528 and Rule 96 govern *in rem* partition proceedings. *Keen v. Campbell*, 249 S.W.3d 927, 931 (Mo. App. S.D. 2008). "Section 528.030 and Rule 96.01 authorize joint tenants and tenants in common to bring an action in partition." *Clark v. Dady*, 131 S.W.3d 382, 386 (Mo. App. W.D. 2004). "In a partition action, the 'court shall determine the interests of the parties and order partition in kind or the sale of the land.'" *Id.* (quoting Rule 96.08). *See also* § 528.030.[7] The subject property of the partition action can be ordered sold and the proceeds

---

[6] The Carpenters incorrectly refer to the trial court's judgment awarding the first $496,000 of the partition net sale proceeds as reimbursement to Kathleen as a "damage award."

[7] Section 528.030 provides:

> In all cases where lands, tenements or hereditaments are held in joint tenancy, tenancy in common, or coparcenary, including estates in fee, for life, or for years, tenancy by the curtesy and in dower, it shall be lawful for any one or more of the parties interested therein, whether adults or minors, to file a petition in the circuit court of the proper county, asking for the admeasurement and setting off of any dower interest therein, if any, and for the partition of the remainder, if the same can be done without great prejudice to the parties in interest; and if not, then for a

10

distributed where partition in kind "cannot be made without great prejudice to the parties." § 528.340 and Rule 96.18. *See also Clark*, 131 S.W.3d at 386. Partition is a question of fact for the trial court and the trial court's findings are given great weight if substantial evidence supports those findings. *Keen*, 249 S.W.3d at 931.

"A party to a partition proceeding is entitled to reimbursement for expenditures on the property for taxes, insurance, and necessary repairs and improvements." *Turner v. Pence*, 514 S.W.3d 98, 106 (Mo. App. W.D. 2017) (quoting *Tadych*, 336 S.W.3d at 177). "To properly qualify for partition sale reimbursements, improvements: (1) must be made in good faith; (2) must be necessary and substantial; (3) must materially enhance the value of the property; and (4) the circumstances reveal that it would be equitable to reimburse the party." *Id*. A party is also entitled to reimbursement for finance or mortgage payments made on the property. *Hahn v. Hahn*, 297 S.W.2d 559, 567 (Mo. banc 1957); *Clark*, 131 S.W.3d at 390.

"A party in a partition action who seeks a credit out of the proceeds for expenses relating to the property must present specific evidence that would permit the trial court to determine the appropriate amount to credit that party without having to resort to speculation." *Calabrese v. Dwyer*, 616 S.W.3d 517, 527 (Mo. App. E.D. 2021). In a partition sale, "reimbursement is effectuated by offsetting the reimbursable expenditures against the sale proceeds partitioned to the other party." *Clark*, 131 S.W.3d at 390. *See also Hoit v. Rankin*, 320 S.W.3d 761, 774 (Mo. App. W.D. 2010).

***Lot Purchase of $31,000, Warehouse Construction for $130,000, and Warehouse Addition Construction for $150,000***

---

sale of the premises, and a division of the proceeds thereof among all of the parties, according to their respective rights and interests.

Here, for their first step in their not-supported by substantial evidence challenge, the Carpenters identify the challenged factual proposition that Kathleen adequately proved that the expenses she presented at trial to support the reimbursement award were all paid from her own personal resources. The Carpenters claim that the expenses and the supporting evidence established instead that these expenses were incurred and paid by two distinct corporations that were not parties to the action and did not have an ownership interest in the property. The Carpenters, however, fail to complete steps two or three of the required framework for lodging a substantial evidence challenge.

On appeal, the Carpenters fail to identify all of the favorable evidence in the record supporting the position that the reimbursed expenses in the judgment were those of Kathleen's personally versus the two corporations. This is the "second-step" of the mandatory three-step framework for lodging a substantial evidence challenge. *See McElvain*, 623 S.W.3d at 773. The Carpenters also fail to demonstrate why the favorable evidence along with the reasonable inferences drawn therefrom is so lacking in probative value that the trial court could not reasonably find that Kathleen should be personally reimbursed for these expenses. "Instead, in direct contravention of the distinct analytical framework expressly required for the type of challenge[] they assert," the Carpenters rely on evidence and inferences *contrary* to the judgment to support their arguments. *Id.* at 774.

"[R]eferring this court to evidence and inferences contrary to the judgment is irrelevant and immaterial to an appellant's point challenging a factual proposition necessary to sustain the judgment as being not supported by substantial evidence." *Id.* at 774-75. "An argument repeatedly and materially based on such evidence and inferences has no analytical or persuasive value and offers no support for [the Carpenter's] claim of error." *Id.* at 75 (quoting *Sugar Ridge*

12

*Props. v. Merrell*, 489 S.W.3d 860, 870 (Mo. App. S.D. 2016)). Thus, the Carpenter's failure to follow the required framework for the asserted claim of error means their argument "is analytically useless and provides no support for [their] challenge." *Id.* (quoting *Langston*, 615 S.W.3d at 116).

Even overlooking the analytical defects in the Carpenter's argument, the Carpenter's contention that substantial evidence does not support the judgment reimbursing Kathleen personally for expenditures for the lot purchase, the warehouse construction, and the warehouse addition, still fails when applying the substantial evidence framework correctly.

We first consider that portion of the judgment reimbursing Kathleen personally for the lot purchase of $31,000, and conclude that substantial evidence supports the judgment awarding Kathleen this amount. As already described, and as evidenced by the August 1994 real estate contract, a lot was purchased in the names of Ace and Sandra as husband and wife, and James and Kathleen as husband and wife, and the property's purchase price was $31,000. Kathleen testified that she and James paid for the lot's purchase with a personal cashier's check, that Ace and Sandra did not contribute money to the purchase, and that Kathleen was never reimbursed.

On appeal, to support their argument that substantial evidence does not support the judgment, the Carpenters cite Sandra's testimony that while Kathleen wrote the check for the lot at the closing, she and Ace reimbursed James $15,000 for their one-half share of the lot's purchase price.[8] The Carpenters also argue that because the real estate contract did not mention the source of the purchase price funds and Kathleen failed to produce a cancelled check, bank statement, or any writing to support her claim that she and James alone incurred this expense,

_____

[8] We note that the Carpenters did not introduce any "documentation" to corroborate their testimony of this payment.

that she was not entitled to reimbursement for this amount. The Carpenter's argument and reference to this evidence and inferences contrary to the judgment "is irrelevant and immaterial to an appellant's point challenging a factual proposition necessary to sustain the judgment as being not supported by substantial evidence." *McElvain*, 623 S.W.3d at 773-74 (quoting *Sauvain*, 437 S.W.3d at 303).

As we have already said, in considering whether there was substantial evidence to support a trial court's judgment, we disregard contrary evidence and we instead consider only the evidence supporting the judgment, including the reasonable inferences from that evidence. *See Ivie*, 439 S.W.3d at 200. On appeal, we disregard and do not consider the Carpenters' contrary evidence that they contributed $15,000 to the lot's purchase. The trial court was free to disbelieve the Carpenter's testimony and "give it such weight as the trial court thought proper." *Pasternak*, 467 S.W.3d at 274 n.6. This Court will not second-guess the trial court's factual determinations. *See id.* at 270.

When disregarding the contrary evidence, Kathleen's testimony that she and James alone paid for the lot's purchase with a personal cashier's check, that Ace and Sandra did not contribute money to the lot's purchase, and that Kathleen was never reimbursed constituted substantial evidence supporting that portion of the trial court's judgment reimbursing Kathleen $31,000 for the lot's purchase.

Next, we address the Carpenters' argument that substantial evidence does not support the trial court's judgment awarding Kathleen personally the $130,000 portion of the reimbursement award for the warehouse's construction. We conclude that substantial evidence supports this portion of the trial court's reimbursement award.

14

Kathleen testified that she and James alone paid back the loan taken out to construct the warehouse. Exhibit E, which Kathleen identified as her check register, showed eleven transfers totaling $130,000 into the joint venture's bank account[9] from October 1994 to June 1995. Kathleen stated that the transfers came from her personal bank account to pay for the warehouse's construction, that the Carpenters did not contribute money to the construction, and that she was not reimbursed for the $130,000 payment.

On appeal, the Carpenters contend that this portion of the reimbursement awarded to Kathleen must be reversed because the evidence established that James was paid back in full for these transfers on December 1, 1995, from the joint venture's bank account. The Carpenters cite Exhibit 9, the joint venture's itemized profit and loss statement for January 1994 through December 1995, in support of their argument, as well as Sandra's testimony that James was reimbursed for the contributions.[10] First, Exhibit 9 shows the contribution of $130,000 by James into the joint venture account in the form of a number of transfers which match Exhibit E, the check ledger. Exhibit 9 also contains a December 1, 1995, entry purporting to show a $130,000 reimbursement to James.[11] Sandra testified that she made the entries in the exhibit in order to

---

[9] The record is unclear whether this bank account was a Mercantile Bank or Commerce Bank account. Exhibit E includes Mercantile Bank deposit receipts but the testimony at trial also referred to this as a Commerce Bank account. Additionally, although Kathleen testified that Exhibit E was "my check register," the exhibit has a handwritten notation of "Jim and Kathy Warehouse Mercantile Bank" notation at the top.

[10] Kathleen also attached this document to her answer and counterclaims to support her allegation that she and James "contributed approximately $130,000.00 to the initial construction and related costs" of building the warehouse located on the property.

[11] Exhibit 9 also corroborates the testimony and Exhibit E that multiple transfers totaling $130,000 were deposited into the joint venture's bank account from October 1994 to June 1995. Exhibit 9 labels the deposits as James' capital contributions.

15

balance the account, under an accountant's advice. Exhibit 9 also has an entry showing that the business paid $1,746 for "loan fees" to a bank on December 1, 1995, and reimbursed James $6,897.58 in interest expenses.

The Carpenters state that Sandra's testimony of reimbursement was "unchallenged" and that there was nothing in the evidence to contradict that James' capital contributions were, in fact, reimbursed. We disagree. The Carpenter's citation to their own favorable evidence—while ignoring the contrary evidence—and their argument that the trial court should have ruled on the issue more favorably to them, is not a "basis for reversal and ignores our standard of review." *Bechtold v. Bechtold*, 453 S.W.3d 813, 815 (Mo. App. S.D. 2014). On appeal, we will not, therefore, reweigh that competing evidence in order to rule for the Carpenters.

"We presume that all evidence was considered by the trial court and we will not reweigh that evidence, even if doing so could yield a different conclusion." *Id.* We presume, therefore, that the trial court considered Exhibit 9 in its entirety as well as the conflicting testimony by the parties, and still found that Kathleen was entitled to a reimbursement for the warehouse's construction. Again, under the proper analytical framework, Kathleen's testimony that (1) the transfers of money came from her personal bank account to pay for the warehouse's construction, (2) the Carpenters did not contribute money to the construction, and (3) Kathleen was not reimbursed for the $130,000 payment constitutes substantial evidence supporting that part of the trial court's judgment awarding her that sum.

We turn now to the warehouse's addition and the $150,000 reimbursement to Kathleen for that expense. At trial, the bank loan marked as Exhibit 2 showed that CFI, not Kathleen or James personally, took out a loan for $150,000 in November 2006, and that by July 2010, the loan was paid back in full. Kathleen admitted in her testimony that this was a business loan.

16

Kathleen testified that she and James paid for the loan to construct the addition out of their personal resources and the Carpenters did not pay any money toward the $150,000 loan. There was, in fact, no testimony from the Carpenters that they contributed any cash to repay the loan.

The Carpenters fail to demonstrate why Kathleen's testimony on this issue does not constitute substantial evidence or why it is so lacking in probative value that the trial court could not reasonably believe the proposition that she was entitled to a personal reimbursement for this expense. Therefore, we will not disturb the $150,000 reimbursement award to Kathleen.

### *Warehouse's Miscellaneous Repairs and Improvements of $185,000*

Next, we address whether substantial evidence supports that portion of the trial court's judgment reimbursing Kathleen $185,000 for what she classified in her brief as "necessary repairs and improvements" to the property. In its judgment, the trial court found that Kathleen "offered proof of various Designers Showroom, Inc., expenses incurred to improve its lease space during the term of its tenancy." We conclude that substantial evidence does not support this finding and that substantial evidence does not support this portion of the trial court's reimbursement award.

DSI was not formed until 2012 as part of the divorce proceedings and Kathleen testified that all expenses she sought reimbursement for occurred *before* the 2012 divorce. Also, as a result of the divorce, Kathleen transferred all of her interest in CFI, the only corporation predating 2012, to James as part of a property settlement agreement in the divorce. Additionally, if DSI, in fact, incurred expenses to improve its lease space during the tenancy, as the trial court found, these expenses would arguably be DSI's responsibility because of the lease agreement between DSI and the joint venture which provided, "Any and all redecorating or other work in or

17

upon the [premises] which may be desired or required by Tenant shall be done by Tenant, at Tenant's sole cost and expenses . . . ."

Kathleen relied on Exhibits J and K as support for these expenditures. Exhibit J was Kathleen's second supplemental answers and objections to the Carpenters' first interrogatories propounded during discovery and it listed additional personal expenditures that Kathleen asserted she made that improved the warehouse. Kathleen testified that the "non-lot/non-building/non-addition expenses" listed in Exhibit J totaled $185,063. Exhibit J included Kathleen's discovery response in which she sought reimbursement for $101,730.71 for "interior *addition* costs" and that this was separate from the $150,000 warehouse addition. (Emphasis added). Exhibit J also included various undated expenditures that, if added to the "interior addition costs" of $101,730.71, would equal approximately $189,000.

The amounts provided in Exhibit J on pages five, eight, and nine purporting to establish the amount of interior renovation costs and other miscellaneous repairs were only bare figures of expenditures and were not supported by any invoices, receipts, or other documentation of when, who or what entity paid for these expenses. Kathleen did state in her testimony that she "personally" paid the expenses but stated that the majority of these expenses occurred before 2012. There was no testimony to support the trial court's finding that *DSI* incurred these expenses to improve the property as DSI was not formed until *after* the 2012 divorce.

Exhibit K contains pages from a 2006 CFI check register and various invoices for materials, work, and labor. Kathleen's testimony, in fact, identifies the bills in Exhibit K as the expenses for the addition to the warehouse and that these were paid from a CFI account. These again, were clearly not DSI's expenditures nor Kathleen's personally. Kathleen was already awarded, and we have affirmed, reimbursement for the $150,000 bank loan taken out to pay for

18

the warehouse's addition. To reimburse Kathleen again for what are clearly the expenses incurred in building the addition, paid for by that loan money, would be a double reimbursement and thus, inequitable.

Substantial evidence does not support the portion of the judgment's reimbursement of $185,000 to Kathleen. The Carpenter's sole point on appeal is granted in part and denied in part.

## Conclusion

Substantial evidence supports that Kathleen be reimbursed for $311,000 from the sale of the property which constitutes Kathleen's unreimbursed expenditures for the lot purchase, the warehouse construction, and the warehouse addition. Kathleen is not entitled to a $185,000 reimbursement for the other purported expenses and improvements made to the property. We affirm in part and reverse and remand in part for entry of a judgment consistent with this opinion.[12]

_Janet Sutton_

Janet Sutton, Judge

Gary D. Witt, C.J., and Daniel White, Sp. J. concur.

---

[12] Kathleen's motion to strike the Carpenters' reply brief is denied.